649 F.2d 967
 8 Fed. R. Evid. Serv. 914
 UNITED STATES of America, Appellee,
v.
Raymond JACKSON, Sr., Appellant in No. 80-2058.
UNITED STATES of America, Appellee,
v.
Danny WILLIAMS, Appellant in No. 80-2059.
UNITED STATES of America, Appellee,
v.
Nate BLACKWELL, Appellant in No. 80-2060.
UNITED STATES of America, Appellee,
v.
Drekie BAILEY, Appellant in No. 80-2165.
 Nos. 80-2058 to 80-2060 and 81-2165.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 24, 1981.
Decided May 22, 1981.
 
 Byrd R. Brown (argued), Brown, Smith & Schwartz, Pittsburgh, Pa., for appellant Raymond Jackson, Sr.
 Bart M. Beier, Pittsburgh, Pa., for appellant Danny Williams.
 Albert G. Feczko, Jr., Pittsburgh, Pa., for appellant Nate Blackwell.
 Lawrence G. Zurawsky, Pittsburgh, Pa., for appellant Drekie Bailey.
 Robert J. Cindrich, U. S. Atty., Paul J. Brysh (argued), Linda L. Kelly, Asst. U. S. Attys., Pittsburgh, Pa., for appellee United States of America.
 Before WEIS and GARTH, Circuit Judges, and MILLER,* Judge.
 OPINION OF THE COURT
 MILLER, Judge.
 
 
 1
 Appellants Jackson, Williams, Blackwell, and Bailey were convicted by a jury of conspiracy to distribute and to possess with intent to distribute heroin and morphine in violation of 21 U.S.C. § 846(a)(1). Jackson, Blackwell, and Bailey were also convicted on one or more counts of distribution and possession with intent to distribute heroin or morphine in violation of 21 U.S.C. § 841(a)(1).[1] All were originally indicted on January 10, 1980, but they were prosecuted pursuant to a superseding 15-count indictment filed February 29, 1980, which included the charges in the original indictment. In addition to conspiracy count 1, Jackson was named in counts 10 through 14, Williams was named in count 9, Blackwell was named in count 15, and Bailey was named in counts 2 and 3. Counts 4 through 8 named as defendants two coconspirators, Calvin Starling and Jerome Collins (a/k/a Shotgun), who, during the interim between the original and superseding indictments, accepted plea bargains, were placed in protective custody, and testified for the government at trial. Appeals from the individual judgments of conviction and sentences have been joined for our review.[2] We affirm.
 
 BACKGROUND[3]
 
 2
 The leader of the conspiracy was Jackson, who gave instructions, ran the operation, and told all of the involved individuals what to do. Blackwell was a "lieutenant" or "turnman" that is, he distributed the drugs to the street dealers, received the proceeds from the sales by the dealers, and turned the money over to "the top man." Bailey, Collins, and Starling were street dealers. Williams was the "cutman," who diluted the drugs, using quinine. As a street dealer, Starling sold five to six packages of twenty heroin capsules a day, four days a week, at $25 per capsule and made a profit of as much as $700 a day. During the period July to November of 1979, Collins received heroin from Jackson on forty to fifty occasions and from Blackwell "hundreds of times." He sold from two to four packages of twenty heroin capsules a day at $30 per capsule and made a profit of $120 per package.
 
 
 3
 Officer Beverly Stewart of the Pittsburgh, Pennsylvania, police department worked as an undercover narcotics agent in conjunction with the Drug Enforcement Administration ("DEA") from the beginning of July to mid-October 1979. Her assignment was to go to different locations in Pittsburgh to purchase drugs. Between August 6 and September 3, she made approximately ten purchases of pink capsules containing heroin or morphine at Sugar Ray's bar, located in the Hill District section of Pittsburgh. These purchases, which she described in detail in her testimony, included purchases from Bailey on August 6 and 7 and from Jackson (and Collins) on August 30 and September 3; from Starling on August 8 and 9; and from Collins on August 14, 15, and 16. (This evidence relates to counts 1-8 and 10, 11 of the indictment.)[4] On most of these occasions, Officer Stewart was accompanied by Valerie Frazier, a police informant and heroin addict, who introduced her to Bailey and Collins and joined her in some of the purchases, including an exchange with Jackson of some clothes they said were "shoplifted" for some pink capsules of heroin.
 
 
 4
 From July of 1979 to January of 1980, Starling on forty to fifty occasions received heroin in the form of pink capsules from Jackson, which he sold. He also sold heroin received from Blackwell. He received the heroin in Sugar Ray's bar and sold it in and around the bar. On January 29, 1980, he received a package of heroin from Jackson, some of which he sold; on February 6, he paid Jackson for the January 29 package and received another one; on February 15, the procedure was repeated. (These latter transactions relate to counts 1, 12, 13, and 14 of the indictment.)
 
 
 5
 On November 12, 1979, appellants were placed under arrest, as were Starling and Collins. Pittsburgh police officers and agents from DEA conducted a raid on Sugar Ray's bar, for which they had a search warrant, where they arrested Starling for whom they had a warrant. Also arrested at Sugar Ray's was Blackwell, who had gone hurriedly to a back room followed by one of the officers, who observed him about to put a clear plastic bag of pink capsules containing heroin into a freezer and arrested and searched him, finding more bags of such capsules. (This evidence relates to counts 1 and 15 of the indictment.)
 
 ANALYSIS
 Jencks Act
 
 6
 Appellants argue that the trial court erred in refusing to declare a mistrial because of the government's failure to timely provide them with the Jencks Act statement of government witness Valerie Frazier. Following her testimony, defense counsel requested production of statements pursuant to 18 U.S.C. § 3500, but the government claimed that it had turned over to the defense all statements relating to her. Three days later, as the government was concluding its case, defense counsel discovered, and the government admitted, that a statement by her had in fact, not been turned over to the defense. The court, after being satisfied that the statement constituted Jencks Act material, stated it would permit the defense to recall Frazier for further cross-examination if all defense counsel agreed. However, they were unable to agree, and the court thereupon, over defense objection, struck all of Frazier's testimony. Under the Jencks Act, the court could have declared a mistrial, but decided not to do so, being satisfied that the government's failure was not willful or in reckless disregard of its obligation[5] and recognizing that the statement was produced in time for the defense to further examine Frazier before the government rested its case.[6] We do not regard the court's decision as an abuse of discretion. Further, a comparison of the statement, which concerns the sale to Jackson by Frazier and Stewart of the allegedly shoplifted clothing in exchange for drugs, with Frazier's testimony discloses no discrepancies or omissions which would have been helpful to appellants. See United States v. Niederberger, 580 F.2d 63, 71 (3d Cir.), cert. denied, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978).
 
 
 7
 Williams complains that the government had blacked out several portions of the copy of a DEA report on Government witness Collins which it turned over to the defense prior to Collins' testimony, but that it was not until the end of the government's main case that a copy of the report with all portions legible was provided; that he was prejudiced by not having had the legible portions for use in cross-examining Collins. However, as pointed out by the government, the blacked-out material was neither a prior statement by Collins that was related to his direct testimony, subject to disclosure under the Jencks Act, nor exculpatory material, subject to disclosure under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[7] Although Collins testified that "Williams was the cutman," while the DEA report states that "once the heroin is in Pittsburgh, Jackson cuts it at Nate Blackwell's apartment in a room of a house that Danny Williams frequents," that statement in the DEA report was not blacked out and was available for use in cross-examination of Collins. We are satisfied that there was no prejudice to Williams.
 
 
 8
 Baily asserts that the government had possession of police reports concerning a statement by Collins about his (Bailey's) having been "discharged," but that such information was not made available to his counsel prior to cross-examination of Collins. He claims that this constituted a violation of Brady v. Maryland, supra, but we are not persuaded that the so-called "Brady Rule" goes this far or that there was any prejudice to Bailey.
 
 Severance
 
 9
 Bailey argues that his counsel "never presented a pretrial motion for separate trial" for him and "never, throughout the trial, requested that the Court grant a separate trial," notwithstanding that counsel for Jackson and Williams requested severance for their clients. This, he says, constituted ineffective assistance of counsel since, by being forced to trial jointly with the other codefendants, he was substantially prejudiced by subsequent events during the trial. However, this issue was not raised below and, in any event, should preferably be considered by the district court. United States v. Garcia, 544 F.2d 681, 684 n.1. (3d Cir. 1976). This may be accomplished in a 28 U.S.C. § 2255 proceeding.
 
 
 10
 Williams argues that the court denied him a fair trial by failing to grant his pretrial motion for severance and a like motion prior to his opening. However, in the interest of judicial economy and recognizing the tactical disadvantage to the government from disclosure of its case, the participants in a single conspiracy should ordinarily be tried jointly as long as "the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants" and notwithstanding that the evidence against one codefendant is more damaging than that against another. United States v. DeLarosa, 450 F.2d 1057, 1064-65 (3d Cir. 1971). Accordingly, we conclude that the court did not abuse its discretion in denying these motions. Another motion for severance was offered after the court struck the testimony of Valerie Frazier, who had testified that Williams did not participate in the overt act charged in count 9. As to this, the government points out that Williams called Frazier to testify as part of his case, and that she repeated that Williams did not participate in the overt act. He asserts that her credibility was "shattered" and her use as a witness was "minimal." However, the jury acquitted Williams on count 9, demonstrating that he was not prejudiced from the striking of her earlier testimony.
 
 
 11
 The denial of the motions for severance was not an abuse of discretion.
 
 Chain of Custody of Contraband
 
 12
 Appellants argue that the government failed to establish a sufficient, unbroken chain of custody of the contraband admitted in evidence against them and that the court abused its discretion in admitting such evidence. It is pointed out that the criminalist at the Allegheny County Crime Laboratory who received envelopes containing the evidence against them (capsules) from a police officer was unable to state whether the envelopes were sealed when received. It is stressed that the evidence was kept in an unsecured locker, which did not segregate different items of evidence and was accessible to all five criminalists in the laboratory. Blackwell cites United States v. Clark, 425 F.2d 827, 833 (3d Cir. 1970) for the statement that "an object connected with a crime must be shown to be in substantially the same condition as when the crime was committed before it can be admitted"; also Gass v. United States, 416 F.2d 767, 770 n.8 (D.C.Cir. 1969) for the statement that "(i)t is generally recognized that tangible objects become admissible in evidence only when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense." However, these statements are to be read in light of the principle that such evidence is admissible if the trial judge determines that "there is a reasonable probability that the evidence has not been altered in any material respect since the time of the crime" (United States v. Luna, 585 F.2d 1, 6 (1st Cir.) cert. denied, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978), citing United States v. Brown, 482 F.2d 1226, 1228 (8th Cir. 1973)); further, the trial judge's determination, that the showing as to identification and nature of contents is sufficient to warrant reception in evidence of the results of a test on the article, may not be overturned except for a clear abuse of discretion (United States v. Clark, supra at 833); still further, "(t)here is a presumption of regularity in the handling of exhibits by public officials" (United States v. Coades, 549 F.2d 1303, 1306 (9th Cir. 1977), and the trial judge is entitled to rely on that presumption (United States v. Luna, supra at 6). Considering the foregoing and the government's detailed evidence of careful handling of the capsules by police officers and laboratory criminalists, we are persuaded that the court did not abuse its discretion in admitting the evidence.
 
 Morphine
 
 13
 Conspiracy count 1 of the indictment includes morphine as well as heroin. Overt act 2 of count 1 charges that on or about August 7, 1979, Bailey knowingly, willfully, and unlawfully distributed a quantity of morphine; and count 3 charges that on or about August 7, 1979, Bailey knowingly, willfully, and unlawfully distributed and possessed with intent to distribute a quantity of morphine. Jackson argues that there was no testimony showing "any understanding, agreement or offer to sell morphine relating to any of the appellants or government witnesses" and that "there was not sufficient evidence of conspiracy to distribute morphine which would warrant submission of said matter to the jury."
 
 
 14
 As related in Jackson's brief, Officer Stewart testified that on August 7, 1979, she approached Bailey and asked him for two "things" "meaning heroin"; that she gave him $60 and received two pink capsules which, when tested by the Allegheny County Crime Laboratory, turned out to be morphine; that on August 8, 1979, she approached Calvin Starling and asked him for two "things" of heroin, gave him $60 and received what she believed to be heroin in two pink capsules which, when tested, was morphine. In his brief, Jackson admits that there was testimony that heroin allegedly purchased from Bailey and Collins and found on Blackwell was packaged in pink capsules and that this was "the normal method of packaging by the alleged co-conspirators during this period of time." However, his brief overlooks that both sales were made at Sugar Ray's bar, the site of numerous heroin sales, and that Stewart followed Bailey into the bar at the time of the first sale and observed him retrieve a plastic bag, following which he came over and gave her a second pink capsule. Also, it is significant that the sales were made by two different coconspirators at two different times.
 
 
 15
 Under the circumstances, we conclude that the court properly refused to strike "morphine" from conspiracy count 1. It was not necessary to show that Jackson explicitly agreed to distribute or to possess morphine. United States v. Powell, 564 F.2d 256, 258 (8th Cir. 1978). Nor was it necessary that each member of the conspiracy be shown to have dealt with the same drugs. United States v. Mallah, 503 F.2d 971, 976 (2d Cir. 1974). As said in United States v. Perry, 550 F.2d 524, 528-29 (9th Cir. 1977):
 
 
 16
 For the convictions to stand, the government must produce enough evidence to show that each defendant knew or had reason to know the scope of the distribution and retail organization involved with the illegal narcotics, and had reason to believe that their own benefits derived from the operation were dependent upon the success of the entire venture.
 
 Publicity
 
 17
 Appellants point to the newspaper, radio, and TV reports concerning the trial which appeared between commencement of trial on May 15, 1980, and May 19, when trial was scheduled to resume following a weekend recess. In chambers, before resumption of trial, defense counsel called the court's attention to the reports, and counsel for Williams asked the court to examine the jurors, who were unsequestered, individually to ascertain whether they had read or heard anything about the case. The court, observing that it had "specifically, on more than one occasion, instructed the jury that they were not to read any newspaper accounts concerning the trial or listen to any radio or television accounts," said that it would "inquire as to whether any of them have (read or listened to newspaper, radio and TV reports)," but would conduct an individual voir dire of only those jurors who said they had been exposed to publicity about the case. When the trial resumed, the court said:
 
 
 18
 Members of the jury, I want to again instruct you that during the course of the trial you must not discuss the case in any manner among yourselves or with anyone else, and you must not permit anyone to attempt to discuss it with you or in your presence, and insofar as the lawyers are concerned as well as others whom you may come to recognize as having some connection with the case, you are instructed that in order to avoid even the appearance of impropriety you should have no conversation whatever with those persons while you are serving on the jury.
 
 
 19
 You must also avoid reading any newspaper articles that might be published about the case now that the trial is in progress, and you must also avoid listening to or observing any broadcast news program on either television or radio because of the possibility that mention might be made of this case during such a broadcast.
 
 
 20
 The reasons for these cautions, of course, lies (sic) in the fact that it will be your duty to decide this case solely on the basis of the testimony and evidence presented during the trial without consideration of any other matters whatsoever.
 
 
 21
 If at any time during the trial you read or hear something outside the courtroom that you think will influence your decision, please bring it to my attention through the bailiff, Mrs. Flaherty.
 
 
 22
 Have any members of the jury since the beginning of this trial read any newspaper accounts or heard or listened to any radio or television accounts concerning this case and this trial?
 
 
 23
 There was no response, the trial was resumed.
 
 
 24
 Appellants, citing United States ex rel. Doggett v. Yeager, 472 F.2d 229 (3d Cir. 1973),[8] argue that the court erred in not questioning each juror in camera. They quote from a recommendation of the American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial, 3.4(a), which was quoted in Doggett :
 
 
 25
 Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors.
 
 
 26
 They also quote from Coppedge v. United States, 272 F.2d 504, 508 (D.C.Cir.1959), cert. denied, 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961):
 
 
 27
 It is too much to expect of human nature that a juror would volunteer, in open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial.
 
 
 28
 This court has made it clear that it would "refrain from finding reversible error upon the mere speculation of prejudice" and that "large discretion would remain in the trial judge in ruling on the issue of prejudice" in connection with newspaper reports. United States v. Armocida, 515 F.2d 29, 49, cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed. 84 (1975).[9] To require the trial court to conduct an individual voir dire of all of the jurors, who have been repeatedly and properly instructed regarding news media reports, whenever there are prejudicial news media reports, rather than to limit the voir dire to jurors, if any, who have seen or heard such reports, is not consistent with the "large discretion" needed by the court to move the trial along both expeditiously and fairly. With respect to the quotation from Coppedge v. United States, supra, there is an obvious difference between asking a juror in open court whether he or she would be influenced in his verdict and asking whether he or she has merely seen or heard a news media report, as was done here. The substantial differences between this case and United States ex rel. Doggett are apparent from what the court said there, supra at 233-34:
 
 
 29
 Thus, we have before us a case in which prior to the commencement of a trial, counsel, anticipating adverse newspaper accounts, requested an adjournment; where, during the trial highly prejudicial newspaper accounts did in fact circulate in the small community in which the trial was being held; where it was established that at least two of the unsequestered jurors had read the highly prejudicial newspaper accounts despite an admonition not to do so; where an examination as to whether others had also disregarded the admonition was made en banc rather than individually; where no inquiry was made as to whether the two jurors who concededly read the prejudicial newspaper accounts discussed them with others; where an additional page one prejudicial newspaper account circulated in the same small community in the vicinity of the unsequestered jury; where the court would not even permit inquiry respecting exposure of the jurors to the later newspaper account although the jurors had access to the newspaper in question; and where the defendant's position was at all times after the first newspaper account appeared urged upon the court by timely motions for a mistrial and a continuance.
 
 
 30
 In view of the foregoing, we hold that the procedure followed by the trial court was neither an abuse of discretion nor error.[10]
 
 Taped Recordings
 
 31
 Jackson argues that the trial judge abused his discretion in ruling inadmissible two taped recordings as inaudible after two government agents had testified regarding their contents and the participants in the conversations. He quotes from direct examination of Officer James Ramsey as follows:
 
 
 32
 Q. And was the transmission of such quality that you were able to understand the conversation?
 
 
 33
 A. To a degree yes.
 
 
 34
 Q. Do you know who was talking in the transmission?
 
 
 35
 A. Yes. There were two parties that I could identify. One was Raymond Jackson and the other was Calvin Starling.
 
 
 36
 Clearly this testimony did not concern the substance of the conversation or any taped recording, itself, and Jackson admits that while "there was considerable interference in the wireless transmission," it was clear that Starling did in fact engage him in conversation.[11] Jackson also states that "Special Agent Richard Sye of the DEA testified that he listened to the tapes of the alleged transaction and that he could hear money being counted out." However, this testimony was elicited by Jackson's counsel on cross-examination. Therefore, Jackson's complaint that the court "effectively permitted the government to offer selective testimony concerning the tapes and then foreclosed the defense from the use of same" is not well taken.
 
 
 37
 Jackson concedes that the trial judge had considerable discretion regarding the admissibility of a tape recording where there is a serious question of its audibility. United States v. Frazier, 479 F.2d 983 (2d Cir. 1973). See United States v. Powell, supra. Nevertheless, he asserts that by excluding the taped recordings, which the court found inaudible except for "a few occasional words," the defense was deprived of an opportunity to show that there was no such conversation between him and Starling. However, the fact that the tapes were inaudible would not rebut evidence that such a conversation took place.
 
 Evidence of Other Crimes Issue
 
 38
 Appellants contend that the trial court erred in denying their motions for a mistrial because of testimony relating to a prior arrest and a previous indictment brought out on direct examination. They quote from testimony of government witness Starling:
 
 
 39
 Q. Sir, an indictment was handed down January 10, and you were again arrested, is that right?
 
 
 40
 A. That is right.
 
 
 41
 Q. That is an indictment by the federal government.
 
 
 42
 A. Right. We were indicted.
 
 
 43
 Further, they quote from the testimony of Special Agent Sye that he "was present on November 12 when Mr. Starling and the other subjects were arrested." It is their position that the statement "We were indicted" and the reference to "the other subjects" referred to them and that "the jury must have perceived that the prior indictment and arrests related to separate offenses" and, thus, "in the minds of the jurors the defendants were persons with criminal proclivities." It is stated that although defense counsel were aware that the prior indictment and arrests related to several of the counts in the superseding indictment, "it is clear that the jury could not have made this connection." On the contrary, the record is persuasive that it was made clear that the arrests and indictment concerned the same conspiracy for which appellants were being tried pursuant to the superseding indictment.[12] Starling, who was named in both the original and superseding indictments, testified that he was arrested on November 12, 1979, for selling heroin to Officer Stewart, who was, perhaps, the government's principal witness at the trial. Special Agent Sye testified that the arrests on November 12, 1979, and the indictment filed January 10, 1980, and the superseding indictment were all related. We are satisfied that there was no prejudice to appellants and no error.
 
 Search of Blackwell
 
 44
 At the pretrial hearing on Blackwell's motion to suppress evidence, the government showed that on the morning of November 12, 1979, police officers and agents from DEA entered Sugar Ray's bar, where there were some fifteen people, with a search warrant for the bar and with arrest warrants for five persons (not including Blackwell). Officer William Mullen testified:
 
 
 45
 We entered the bar. As we entered the bar, we did observe one of the people we had an arrest warrant for, Calvin Starling, standing toward the front of the bar. We arrested him first after identifying ourselves and showing him a copy of the arrest warrant.
 
 
 46
 Then we went to the bartender, Mr. Raymond Boyd We again identified ourselves, told him we had a search warrant for the premises and gave him a copy of the search warrant.
 
 
 47
 At this time I observed Mr. Blackwell, who was also behind the bar. After we announced our purpose that is, having a search warrant we were going to execute he took a few steps backward and suddenly walked rather hurriedly to the rear of the bar.
 
 
 48
 Officer Mullen related that he followed Blackwell, whom he recognized, back to a little room where there was a freezer, and from the doorway to the room he observed Blackwell about to put a clear plastic bag containing several pink capsules into the freezer; that he took the bag and arrested and searched Blackwell, finding three more clear plastic bags containing pink capsules; that he had on four prior occasions made arrests in and around Sugar Ray's bar during which pink capsules were seized and, upon analysis by the Allegheny County Crime Laboratory, found to contain heroin.[13]
 
 
 49
 Blackwell argues that since he was not named in the search warrant, he was not a lawful object of the search of Sugar Ray's bar; that, at the time of entry, the police did not have probable cause to justify a warrantless arrest. He contends that the facts of this case "are virtually identical to Ybarra v. Illinois,"[14] but concedes that his movement to the rear of the bar is a "real distinction" between Ybarra and the instant case. Indeed, it is that distinction, coupled with his attempt to hide capsules of the type commonly containing heroin, that provided the probable cause for his arrest and search. United States v. Embry, 546 F.2d 552 (3d Cir. 1976), cert. denied, 430 U.S. 948, 97 S.Ct. 1587, 51 L.Ed.2d 797 (1977); United States v. Martin, 386 F.2d 213 (3d Cir. 1967), cert. denied, 393 U.S. 862, 89 S.Ct. 142, 21 L.Ed.2d 130 (1968).
 
 
 50
 There was no error in the court's denial of the motion to suppress.
 
 Sentencing Hearing
 Jackson
 
 51
 Appellant Jackson argues that the trial judge erred in denying him an adequate opportunity to rebut what he terms "unreliable information" used in sentencing. From the record, it is apparent that the argument is premised on the judge's refusal to grant a motion for continuance of the sentencing hearing and, instead, his allowance of a three-hour recess "to enable Mr. Brown (Jackson's counsel) to keep another commitment that he has, as well as to review what evidence he is going to present later tonight." Early in the hearing, after government counsel, at the direction of the court following a request by Jackson's counsel, had outlined testimony he expected to present to supplement the presentence report (which had previously been made available to Jackson), the court stated that "we will give you reasonable opportunity to rebut any evidence presented by the government." Thus, the question is whether, under the circumstances of this case, Jackson received a "reasonable opportunity" for rebuttal.
 
 
 52
 Jackson asserts that he was not afforded notice of the evidence which the government intended to present against him at the sentencing hearing, "none of which was referred to in the pre-sentencing report." He cites no precedent, and we know of none, for the proposition that due process requires that such notice be provided by the government in advance of a sentencing hearing.[15] We are satisfied that, under the circumstances of this case, considering particularly the government's offers of proof at the beginning of the hearing and later during the hearing, the opportunity given for cross-examination of the government's witnesses, and the three-hour recess in the hearing following testimony of all of the government's witnesses, Jackson received a reasonable opportunity for rebuttal.
 
 
 53
 After the recess, Jackson's counsel declared that
 
 
 54
 there is no way, Your Honor, in a three-hour recess, much of which had to be devoted to other things for instance, I had to go and resurrect the tapes to see what if anything was said.[16] I had to go through my file. There was no way that I have had any opportunity to be able to prepare a rebuttal to the testimony of Valerie Frazier, a rebuttal to the testimony of Jerome Collins concerning William Smith and whether he existed, James Smith and whether he existed, and a rebuttal to the testimony of Calvin Starling, any rebuttal to the testimony of the officers who claimed that X told them so and so when they reported the matter. (Emphasis supplied.)
 
 
 55
 He again requested a continuance, which was denied. The court said:
 
 
 56
 I am willing to hear any information that you want to bring to the court's attention, either through Mr. Jackson or through anyone else, that you feel will be helpful to me in the sentencing process.
 
 
 57
 No information other than argument of counsel was forthcoming not even a denial by Jackson of the truth of the testimony referred to. As to counsel's reference to "other things" that occupied "much of his time" during the recess, he stated at the beginning of the hearing that he had "other commitments and conflicts," including taping for a ten-minute weekly radio show.[17] The court pointed out that "this sentencing hearing has been set."
 
 
 58
 As to the testimony of Valerie Frazier, Jackson argues that she testified that he "participated in violent acts," but "never witnessed (him) being violent."[18] The hearsay character of her testimony on this point was clearly brought out during the vigorous cross-examination conducted by Jackson's counsel. Jackson complains that the trial judge "insisted upon receiving this testimony," but the only "insistence" on the part of the court shown by the record was the court's overruling of counsel's motion to strike Frazier's testimony, a proper foundation having been laid, that Jackson's reputation in the community was being "mean and hateful toward other people." Moreover, there was no abuse of discretion in the court's "considering" Frazier's hearsay testimony, since the due process clause "should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure."[19] Williams v. New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949); United States v. Sweig, 454 F.2d 181 (2d Cir. 1972).
 
 
 59
 With respect to the testimony of Jerome Collins, he, like Frazier, testified that Jackson's reputation in the community was that he was "Mean. Hateful." On cross-examination, he was asked for whom he sold narcotics before 1977, and this is when some confusion over the first name of "Smith" appears. However, he eventually settled on "James Smith" and denied counsel's suggestion "that Mr. James Smith is not only unknown to the Court, but he just doesn't exist; he is a fictitious name that you just dreamed up?" The need for rebuttal on such a peripheral matter is not apparent, and we note that Jackson's brief before this court does not even mention it. Collins also testified, on cross-examination, that Jackson paid his legal fees in connection with a state charge for trafficking, dealing, and attempted delivery of heroin, for which he was tried and acquitted. That he was acquitted does not render such testimony inadmissible. Cf. United States v. Metz, 470 F.2d 1140 (3d Cir. 1972), cert. denied, 411 U.S. 919, 93 S.Ct. 1558, 36 L.Ed.2d 311 (1973); United States v. Sweig, supra; Jones v. United States, 307 F.2d 190 (D.C.Cir.1962).
 
 
 60
 Regarding the testimony of Calvin Starling, he stated, inter alia, that Jackson told him that he had hit one Kenneth Butler on the head with a bat; that Jackson told him that one Earl Clancy was a "rip-off artist" "A stick-up man, taking drugs from dealers "; that he was going "To get him killed" for a price of "A thousand dollars in drugs, a thousand dollars cash, and the rest in drugs. $2,000"; that later one Stoney Bey told him "to get in contact with (Jackson) and tell him that the only way he is going to beat the federal rap is to kill the officer (Officer Beverly Stewart), and it would be done"; that he went to his attorney and then contacted the police, "and I was asked would I be receptive to joining them in an investigation into these matters, and I agreed"; that he received money from DEA and was being paid $800 a month; that he had a conversation with Jackson concerning his conversation with Stoney Bey during which Jackson said that Stoney Bey's price (for killing Officer Stewart) was too high and that he could get it done cheaper; that he had a tape device on him and his job (for the government) was to elicit, if possible, "all allusions to the contract to kill Officer Stewart." During vigorous cross-examination by Jackson's counsel, Starling made no material change in this testimony. In response to counsel's request for the government's "reports for this witness," the prosecutor said: "I have given you all the reports on this witness All those statements, every statement this witness made has been produced to Mr. Brown in the trial of the case." We are satisfied that there was no error in receiving the testimony and no abuse of discretion by the court in considering it. Williams v. New York, supra.
 
 
 61
 Officer James Holliday testified, inter alia, that he and his partner, Officer Stegena, interviewed one Earl Clancy at the Presbyterian Hospital; that Clancy had been shot on the previous evening, was listed in critical condition, and was in intensive care; that Clancy could not speak, but identified a James Turner (from among several photographs) and a person known as "Smokey" by writing his name, and added, in writing, "just a contract"; that
 
 
 62
 I asked him if this was said to him at the time of the shooting. He nodded his head again. I asked him if he knew who put the contract out, and he said yes. I mentioned the name Raymond Jackson, and he nodded his head, Raymond Jackson.
 
 
 63
 Officer Holliday stated that Jackson was never charged in connection with this incident for the reason that Clancy would not testify against Jackson and "feared for his life"; that Clancy was subsequently murdered. On cross-examination, Jackson's counsel asked for the original of the officer's report on the interview with Clancy, and the officer provided it. Vigorous cross-examination by Jackson's counsel resulted in no change in testimony, but did bring out that Turner was convicted of shooting Clancy.
 
 
 64
 Officer Patrick McCauley identified a taped interview by him with one James Davis[20] at the police station with respect to an incident that occurred on October 22, 1977, and the prosecutor played it before the court. Davis related in detail that three armed individuals, whom he named, accosted him around nine o'clock in the evening, forced him into an automobile, and drove to the rear of Sugar Ray's bar; that Jackson came out and said to his abductors: "Kill him. Get him out of here"; that he was taken to Westinghouse Park, shot, but escaped; and that the reason given for the attempt on his life was that Jackson said he was ripping his dealers off. On cross-examination, it was brought out that a statement was taken by officers from Davis at the hospital following the shooting, and this and other statements by Davis were turned over to Jackson's counsel. There were no changes in testimony.
 
 
 65
 Jackson complains about "Police officers reading reports of alleged victims of crimes which resulted in the issuance of criminal complaints which were dismissed, but the record shows that only Officer Bello read from a report (from the Allegheny Crime Laboratory) and this without objection by Jackson's counsel. Jackson also complains about "police officers testifying to oral complaints received by city police which never resulted in the filing of a criminal complaint against appellant." However, we are persuaded that there was no error in receiving such testimony and no abuse of discretion by the court in considering it. Williams v. New York, supra. Indeed, as related above, the reasons why criminal complaints either were not filed or were dismissed were clearly explained by the officers.
 
 
 66
 It is, of course, true that due process is violated if the sentence is based on extensive and materially false information. Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); Moore v. United States, 571 F.2d 179 (3d Cir. 1978); United States v. Myers, 374 F.2d 707 (3d Cir. 1967). However, there is nothing in the record to show that this occurred here.[21] The court's statement that it would "take into consideration" all of the trial testimony, the presentence report, and "what I have heard here today" does not equate with reliance on extensive and materially false information. See United States v. Weiner, 418 F.2d 849 (5th Cir. 1969); United States v. Weiner, 376 F.2d 42, 43 (3d Cir. 1967). Also, the basis for the severe sentence imposed is apparent from the court's comments at sentencing, following a statement by counsel that the record showed that Jackson had been involved in heroin traffic for at least ten years:
 
 
 67
 THE COURT: Mr. Jackson, you were the leader of a large scale drug organization which law enforcement officials estimate handled $40,000 worth of drugs a week. The primary drug peddled by this ring heroin has destroyed the lives of many individuals and their families.
 
 
 68
 No doubt much of the $40,000 reported to have been spent by narcotics users to buy their drugs was acquired illicitly through robbery, burglary and theft. In this way, the tragedy of drug use extends beyond the individual user to affect the entire community.
 
 
 69
 You were first convicted of a drug-related offense in 1962. Two other convictions followed. Apparently drugs are a way of life for you, and although it is possible to feel some pity for an addict whose addiction may be beyond his control, you are not an addict. You do not sell drugs to feed your own habit. You sell drugs strictly for monetary gain, preying upon the weaknesses of others, enticing individuals into a way of life that can only lead to tragedy and sadness.
 
 
 70
 You are best removed from the community so you can do no more harm
 
 Other Appellants
 
 71
 Appellants Williams, Blackwell, and Bailey argue that their sentences should be vacated and a new sentencing hearing ordered, grounded in part on the allegation that Jackson was denied due process which resulted in his being shown "to be a bad individual" and in their character and reputation being tainted thereby. As indicated above, we reject the argument that Jackson was denied due process.
 
 
 72
 Williams argues that "the trial judge most likely subconsciously took into account all of the adverse presentencing testimony he heard concerning defendant Jackson into consideration when sentencing defendant, Danny Williams." This, of course, is pure speculation and rests on the hypothesis that it was the reason for his receiving the maximum penalty despite "the facts that no sentencing witnesses testified against Williams and that he had never been previously arrested or convicted of any crime." It ignores what the court said when sentence was imposed:
 
 
 73
 THE COURT: Although you were convicted on only one count of a 15-count indictment, you played a vital role in a large-scale drug organization.
 
 
 74
 There was testimony that you in fact were second in command.
 
 
 75
 The harm caused by the sale of drugs is irreparable. You played an important role in destroying lives, in breaking up families and in promoting further crime
 
 
 76
 Williams also argues that "the defendant in the instant case was not given a meaningful opportunity to challenge the accuracy of the hearsay information relied on (by the court)." Contrary to the argument, the record shows that the court stated that if there were any comment on the presentence report, which the attorneys and the defendant had an opportunity to read, "or anything additional" he would hear it. Williams' counsel called the court's attention to one error in the presentence report, which the court instructed the probation officer to correct, and called one character witness. To the extent that Williams' argument might be intended to refer to Jackson, that point has already been covered.
 
 
 77
 Blackwell argues that, in sentencing him, the court relied on "inaccurate" evidence during trial, portraying him as a "lieutenant" in Jackson's organization and placed "great emphasis" on his importance in the organization, asserting that "The severity of the sentence rendered by the trial court must be viewed as a product of this reliance." Although the court did comment on his being "an important part of a large-scale drug organization," which is shown by the trial evidence, the court also said:
 
 
 78
 You have been in trouble before, but not regularly. In 1976, however, you seemed to have found a life that suited you
 
 
 79
 You have affected many lives in providing the drugs which addicted numerous individuals and in promoting the crimes which are perpetrated to pay for the drugs. If returned to the community, you would likely return to the style of life you have found most comfortable and more lives would be adversely affected.
 
 
 80
 We are persuaded that the severity of the sentence was the product of these considerations rather than reliance on his "importance" in the organization, although such reliance would not have been improper.
 
 
 81
 Blackwell also argues that he was prejudiced by the presentence report indicating that he has not shown any remorse, saying that his lack of remorse "is due to his refusal to accept the status assigned to him at trial, viz. that of lieutenant in Raymond Jackson's organization." He asserts that "To penalize a man for not showing remorse under the instant circumstances, is to penalize him for exercising his Fifth Amendment right against self-incrimination." However, at sentencing, Blackwell's counsel argued the point of lack of remorse somewhat ambivalently as follows:
 
 
 82
 The only problem I have in that regard is that Mr. Blackwell has steadfastly maintained that he was not involved in the organization itself. He was a bartender. He was caught with the goods, as the Court recalls the testimony, and we did stipulate that he possessed the drugs on that very day that he said he was involved with that one incident, which I think was November 12, 1979. He did admit possession of the drugs, so it would be impossible, I guess, for an individual who has maintained that he was a bartender, that he was there at the time, that he was found with the drugs, to indicate remorse.
 
 
 83
 Obviously, he is sorry that he had the drugs on him that day. I'm sure of that, but he has never indicated to me or to the court and I think there is no indication in the presentence report that he has admitted being involved in the organization.
 
 
 84
 It would seem that under the circumstances detailed in counsel's statement, it would be highly possible to indicate remorse, and perhaps that is what counsel intended; also, counsel's statement that Blackwell was sorry he had the drugs on him that day appears to fall somewhere in between regret over being caught and a grudging recognition of guilt. It would not have been necessary for Blackwell, a convicted coconspirator, to show remorse over being a member of Jackson's organization, thereby jeopardizing a possible appeal. What could be expected, however, was his personal statement of remorse relative to possession of drugs. Instead, his statement to the court was merely that "I wasn't involved in no drugs or anything." In any event, the points in the quoted portion of the court's statement were clearly sufficient to support the sentence.
 
 
 85
 Bailey argues that it is "reasonable to believe that the impression created in the mind of the sentencing Court (by the presentencing testimony concerning Jackson) was adverse with respect to all members of the conspiracy resulting from their association with Jackson." He states that this belief is supported by the unduly severe sentence, "unless one considers that Jackson, the alleged ringleader, received a sentence of 45 years." We regard the belief as mere speculation. The severity of the sentence obviously rests on factors set forth in the court's statement when sentence was imposed:
 
 
 86
 THE COURT: Mr. Bailey, you have a long criminal record, including convictions for several drug-related offenses. You admit a long history of drug use dating back to 1961 when you were just 21 years old. Your long criminal record and your drug use are obviously related. Although you have at least on one occasion sought help to escape your drug addiction and have received similar help while incarcerated on other occasions, you have always returned to the use of drugs and the criminal activity with which that use necessitates.
 
 
 87
 That criminal activity has taken the form of selling drugs, which in turn ruins other people's lives and forces them into crime.
 
 
 88
 Your presence in the community, therefore, not only promotes your own crime, but also the crime of others
 
 
 89
 Bailey also argues that he was denied an opportunity to cross-examine any of the government's presentence witnesses (against Jackson) and mentions Valerie Frazier in particular because, he says, Frazier did not witness an actual beating of the alleged victim and did not see who, if anyone, administered the beating, so that he was unduly prejudiced by the allegation that he participated in the beating. However, at sentencing, his counsel, although pleading eloquently for leniency, said nothing about inability to cross-examine such witnesses or any allegation of participation in the beating. Moreover, on cross-examination, Jackson's counsel effectively brought out the weakness of Frazier's testimony concerning a beating and any participation by Jackson and Bailey. We are not persuaded that Bailey suffered any undue prejudice.
 
 
 90
 In view of the foregoing, we hold that the trial court did not abuse its discretion and did not commit error in sentencing appellants.
 
 
 91
 The judgments of the district court will be affirmed.
 
 
 92
 GARTH, Circuit Judge, concurring and dissenting.
 
 
 93
 I concur in all respects with the affirmance of the convictions of the defendants in this case. The only aspect of the majority opinion with which I disagree is that concerning the actions taken by the district court at the time of Jackson's sentencing.
 
 
 94
 I can understand only too well the problems faced by a district court judge with a heavy calendar on sentencing day, and his desire to impose sentences on all defendants in a multi-defendant case at the same time. Nevertheless, in this case apparently no notice had been given either to the court or to the defendant that the government intended to produce a number of witnesses whose testimony could influence the sentence to be imposed on Jackson. I do not suggest that in every case where the government produces witnesses at sentencing, continuances should be granted. Nor do I suggest that the procedure adopted by a district court is not one within the sole discretion of that court. I point out only that in this case, the government produced eight witnesses to testify about various aspects of Jackson's propensities, background, character and general temperment. Their testimony, as the record reveals, referred to particular incidents, some of which were questioned by Jackson's attorney. Jackson's counsel, not having been alerted to the government's plan, apparently had not come prepared for an extended hearing. He immediately requested additional time, so that he could present evidence in mitigation of the testimony produced by the government. It was this request that was denied.
 
 
 95
 In a case that presented the many unusual aspects that apparently this case had, and which among other things prompted the United States Attorney to come forward on sentencing day with some eight witnesses, it appears to me that the better course of action would have been to allow Jackson's attorney some additional time in which to prepare a response to the government's witnesses and to produce affirmative evidence on Jackson's behalf. This is not to say that I regard the sentence imposed upon Jackson as unfair or improper. My only concern is that in the unusual circumstances presented here, I believe that Jackson should have been given an opportunity to respond to the evidence which the government produced as this evidence might have affected the sentence. In my view, Jackson should have been given the opportunity to produce those proofs which he claimed were necessary to put the sentencing proceeding into proper perspective and to rebut, if he could, the evidence of the government. Thus, rather than affirm Jackson's sentence at this point, I would remand to the district court with the direction that a hearing be held at which the government and the defendant could produce testimony with respect to sentencing.
 
 
 96
 In suggesting this disposition, I do not for one moment intimate that this hearing should not be conducted by the same judge who presided at the original sentencing hearing and I express no opinion as to the sentence imposed upon Jackson. After an opportunity has been afforded Jackson to present evidence and to rebut the government's evidence, if the sentencing judge is still of the opinion that Jackson should be sentenced to the same sentence as he imposed on July 11, 1980, I perceive no reason why that sentence should not be reimposed. I emphasize that I do not advocate this extended procedure in every routine sentencing that takes place. Here, however, because of the unusual circumstances surrounding the sentencing procedure, I believe that the district court judge may have exceeded the proper exercise of his discretion in denying a continuance.[1]
 
 
 
 *
 The Honorable Jack R. Miller, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation
 
 
 [1]
 Jackson was convicted on counts 1, 10, 11, 12, 13, and 14 and was sentenced to consecutive terms of 15 years imprisonment on counts 1, 10, and 11; on each of counts 12, 13, and 14 he was sentenced to 15 years imprisonment to run concurrently with the sentence on count 1. He also received a special parole term of 4 years
 Williams was convicted on count 1 and was sentenced to 15 years imprisonment. He was acquitted on count 9.
 Blackwell was convicted on counts 1 and 15 and was sentenced to consecutive terms of 15 years imprisonment. He also received a special parole term of 2 years.
 Bailey was convicted on counts 1, 2, and 3 and was sentenced to consecutive terms of 10 years imprisonment. He also received a special parole term of four years.
 
 
 [2]
 Pursuant to Rule 28(i) Fed.R.App.P., Jackson, Blackwell, and Bailey have each adopted pertinent parts of the briefs of all other appellants
 
 
 [3]
 Based on evidence at trial viewed in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). That evidence clearly supports the verdicts
 
 
 [4]
 Officer Stewart also made a purchase on August 28 from Collins and observed Williams handling the money. This has to do with counts 1 and 9; as previously noted, Williams was acquitted on count 9
 
 
 [5]
 The prosecutor said:
 I am prepared to offer the testimony of Agent Sye in this matter to establish that this was a complete inadvertence on the part of the government and was not any intentional withholding. He would testify, of course, that this case was a complex case involving two jurisdictional investigations, and of course, we provided I think all the other Jencks material timely maybe not as early as we should have to avoid delays, but timely and this statement was apparently prepared and was inadvertently not typed, and he was not aware of it until he was going through the original notes, and the witness is still available and we are still in the government's case.
 To this the court said: "First of all, I have considered your failure to do it as inadvertent. I have never considered it otherwise because there has been no indication that you deliberately did it "
 
 
 [6]
 Under similar circumstances, it has been held that the statutory alternatives of striking the witness' testimony or declaring a mistrial are not mandatory, and whether to follow a different course rests with the discretion of the trial judge. United States v. Pope, 574 F.2d 320 (6th Cir.), cert. denied, 439 U.S. 868, 99 S.Ct. 195, 58 L.Ed.2d 179 (1978); United States v. Principe, 499 F.2d 1135 (1st Cir. 1974); United States v. Gottlieb, 493 F.2d 987 (2d Cir. 1974). Appellants cite United States v. Kasouris, 474 F.2d 689 (5th Cir. 1973), but, unlike this case, the conduct of the prosecutor there "turned toward deliberate suppression."
 
 
 [7]
 The blacked-out material either concerned persons involved in Jackson's operation who were neither witnesses nor defendants, or was not addressed by Collins' direct testimony (United States v. Keller, 512 F.2d 182, 186 (3d Cir. 1975); or it concerned activities of Jackson not covered in that testimony. The blacked-out statement that "Jackson obtains his quinine for cutting the heroin from May's Drug Store in the Homewood section of Pittsburgh and Bardin's Drug Store on 5th Avenue" can hardly be said to necessarily conflict with Williams being a cutman and, therefore, to constitute exculpatory material
 
 
 [8]
 The Doggett appeal involved a habeas corpus proceeding relating to a trial in a New Jersey state court
 
 
 [9]
 The court cited United States v. Manning, 440 F.2d 1105, 1112, cert. denied, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971), in which the Fifth Circuit declared that "(i)t is within the discretion of the trial court to interrogate or poll the jury to ascertain whether they have read newspaper articles pertaining to the trial." It also cited Gordon v. United States, 438 F.2d 858, 873-74 (5th Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 rehearing denied, 404 U.S. 960, 92 S.Ct. 312, 30 L.Ed.2d 279 (1971), where the court said that the law will not presume that the jurors ignored repeated instructions of the court not to read or listen to the news media during pendency of the trial and quoted from Mr. Justice Holmes in Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 5, 54 L.Ed. 1021 (1910): "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."
 
 
 [10]
 We note that the procedure is the same as that required by the Seventh Circuit which, in Margoles v. United States, 407 F.2d 727, 735, cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969), said:
 Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further
 This is the procedure preferred by the Fourth Circuit, which has indicated that it believes the above-quoted recommendation of the American Bar Association Project on Standards for Criminal Justice "goes too far." United States v. Hankish, 502 F.2d 71, 77 (4th Cir. 1974). The procedure was reaffirmed in United States v. Jones, 542 F.2d 186, 194 (4th Cir. 1976).
 
 
 [11]
 Starling had been outfitted by DEA with a wireless transmitter and had entered Sugar Ray's bar for the purpose of involving Jackson in the sale of heroin
 
 
 [12]
 The conspiracy count of the original indictment of January 10, 1980, covered the period from "on or about August 1, 1979, up to on or about November, 1979"; the period in the superseding indictment was from "on or about July, 1979, up to on or about February 15, 1980."
 
 
 [13]
 Officer Mullen's affidavit supporting the search warrant stated that an informant had seen Jackson give Blackwell a few plastic bags of pink capsules and Blackwell put them in a room at the back of the bar
 
 
 [14]
 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)
 
 
 [15]
 Under Rule 32, Fed.R.Crim.P., there is no requirement that the presentence report be made available to the defendant in advance of the sentencing hearing. Moreover, the provision for disclosure of the report to a defendant was the result of a change in policy in 1966 (from no requirement that the court disclose the report at any time) and was accompanied by the Advisory Committee's statement that "(i)t is not a denial of due process of law for a court in sentencing to rely on a report of presentence investigation without disclosing such report to the defendant or giving him an opportunity to rebut it." Advisory Committee Note to 1966 Amendment to Subdivision (c)(2) of Rule 32 Fed.R.Crim.P. If there is no constitutional right to disclosure of the presentence report at any time, much less in advance of the hearing, it follows that there is no such right to advance disclosure of the evidence that the government intends to present, although, of course, the defendant is entitled to present evidence in rebuttal. 18 U.S.C. § 3500 and Rule 16, Fed.R.Crim.P. do not require the government to disclose the names of witnesses prior to their testimony on direct examination at trial. (The sole exception is in a capital case, as provided by 18 U.S.C. § 3432.) See United States v. Mitchell, 540 F.2d 1163, 1166 (3d Cir. 1976), cert. denied, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); United States v. Addonizio, 451 F.2d 49, 62 (3d Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972)
 
 
 [16]
 The tapes referred to are those which the court, during trial, ruled inadmissible as inaudible
 
 
 [17]
 The court advised counsel that the recess would enable him to be present for the taping at 5 o'clock. The recess was called at 3:55 p. m. and the court stated that it would reconvene at 7:00 p. m
 
 
 [18]
 Frazier also testified that, "I guess starting about 1976 in the summer," she went to Sugar Ray's bar to buy heroin. On cross-examination she was asked whether she knew that Sugar Ray's bar was closed from 1974 to 1977. She replied: "No, I did not. It was open in 1976." Jackson's counsel stated to the court that a continuance of the hearing was needed to rebut such testimony and that "the information that I have leads me to believe that the bar was closed sometime in 1974 and was not reopened until 1976." Of course, such information does not necessarily conflict with the cited testimony. Even if the bar were closed during all of 1976, Frazier's testimony was merely that starting "about 1976" she went to the bar to buy heroin
 
 
 [19]
 18 U.S.C. § 3577 provides:
 No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a Court of the United States may receive and consider for the purpose of imposing an appropriate sentence.
 
 
 [20]
 Davis was called at the hearing, but stated through his lawyer that he would take the Fifth Amendment to all questions. The court considered that he could not be ordered to testify unless he was granted immunity; and since the government was not prepared to take such action, the witness was excused
 
 
 [21]
 Jackson points to the court's statement, "Under the circumstances described in the previous witnesses' testimony and this testimony (that of police officer Bello) I hold that the testimony is from a reliable source." The "reliable source" referred to was one Kenneth Butler, and "the circumstances" were those described by the officers under which Butler gave them information about Jackson. Officer Balsanico testified that Butler, in "quite a disarray," came up to his desk in the police station, asked for some assistance, and related (in the presence of other officers) that he had been struck on the head by Jackson at Sugar Ray's bar and knocked out; that when he awakened, Jackson had a gun on him and stated that he would shoot him or his wife "if he messed with him again." Officer Bello testified that Butler told him that he had been struck with a baseball bat by Jackson, and on this basis an arrest warrant for Jackson was issued. Cross-examination of the officers by Jackson's counsel resulted in no change in their testimony. In holding that, under the circumstances described by the officers, Butler was a reliable source, the court undoubtedly concluded that the information Butler furnished them was probably accurate, and Jackson's arguments do not persuade us to second-guess the court on that point
 
 
 [1]
 I observe that the discretion of the court is also invoked with respect to Fed.R.Crim.P. 32(c). Under that rule, if the defendant requests permission to examine the pre-sentence report, the court shall afford him that opportunity, with certain exceptions, before imposing sentence. The rule goes on to note:
 (t)he court shall afford the defendant or his counsel an opportunity to comment thereon and, at the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in the presentence report.
 Thus, as I read this rule, in the event a defendant challenges the factual accuracy of matters contained in the report, it might be necessary to continue the sentencing proceeding so as to permit the defendant to introduce testimony.
 The rule, therefore, requires no more nor no less than I would advocate under the circumstances present here. The same principle is invoked before sentence is imposed an opportunity must be afforded for the presentation of any factual disagreement.