PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-1493, 14-2677 and 14-3975

UNITED STATES OF AMERICA

v.

KIDADA SAVAGE, agent of DA, agent of LI'L SIS, agent
of DIZMATIC, STEVEN NORTHINGTON, also known as
Smoke, also known as S1, also known as Syeed Burhannon,
also known as Michael Tillery, also known as Darnell Doss,
agent of Dollar Bill, ROBERT MERRITT, a/k/a
CORRECTIONAL OFFICER BISHOP, a/k/a B.J., agent of
DIRT

Kidada Savage,
                Appellant in No. 14-1493
Steven Northington,
                Appellant in No. 14-2677
Robert Merritt, Jr.,
                Appellant in No. 14-3975
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 2-07-cr -00550-006, 005, and 004)
District Judge:  Honorable R. Barclay Surrick
_____

Argued
December 15, 2022

Before:   JORDAN, FUENTES and SMITH, *Circuit Judges*

(Filed:  October 24, 2023)
_____

Mark A. Berman   [ARGUED]
Michele A. Smith
Hartmann Doherty Rosa Berman & Bulbulia
433 Hackensack Avenue – Suite 1002
Hackensack, NJ   07601
     *Counsel for Kidada Savage*

Thomas C. Egan, III  [ARGUED]
618 Swede Street
Norristown, PA   19401
     *Counsel for Steven Northington*

Susan M. Lin   [ARGUED]
Kairys Rudovsky Messing Feinberg & Lin
718 Arch Street – Ste. 501 South
Philadelphia, PA   19106

William R. Spade, Jr.
368 Laurel Chase Drive
Blowing Rock, NC   28605
     *Counsel for Robert Merritt*

John M. Gallagher
Office of United States Attorney
504 W. Hamilton Street – Suite 3701
Allentown, PA   18101

David E. Troyer
Robert Zauzmer   [ARGUED]
Office of United States Attorney
615 Chestnut Street – Suite 1250
Philadelphia, PA   19106
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

The three appellants before us – Kidada Savage, Steven Northington, and Robert Merritt – are serving life sentences for their roles in the Kaboni Savage Organization ("KSO"), a violent drug trafficking gang that was based in North Philadelphia.  The gang dealt in death and destruction, including on one occasion the firebombing of the family home of a former KSO member who had become a government witness.  That firebombing killed six people, including four children.

We previously upheld the conviction and death sentence of the gang's eponymous ringleader, Kaboni Savage, who ordered the firebombing.  (To avoid confusion, this opinion refers to Kaboni Savage and his sister Kidada Savage by their first names.)  In a corresponding opinion, we considered and

rejected all appellate arguments raised by Kaboni, most of which had been advanced or adopted by Kidada, Merritt, and Northington. *See United States v. Savage*, 970 F.3d 217, 231 (3d Cir. 2020). In the pages that follow, we resolve the remaining arguments.

## I. BACKGROUND

Under Kaboni's leadership, the KSO sold powder cocaine, "crack" cocaine, and liquid phencyclidine ("PCP") in North Philadelphia from 1997 through 2010. Each of the three appellants was affiliated in some way with the KSO. While Kaboni was incarcerated, Kidada coordinated KSO activities and issued orders to other KSO members on her brother's behalf. Northington worked for the KSO as a drug dealer and enforcer. On Kaboni's instructions he caused and aided one murder and committed another.[1] Merritt, while not a full-fledged KSO member, sold drugs for the organization, often

---

[1] As discussed in more detail below, Northington controlled a drug block in North Philadelphia. He drove non-party Lamont Lewis to the drug block and identified rival dealer Barry Parker, who Lewis then shot for encroaching on the territory. Northington also participated in the murder of Tybius Flowers the day before Flowers was scheduled to testify against Kaboni in a state-court murder trial.

with his older cousin, KSO member Lamont Lewis, and he participated in the firebombing murders.[2]

## A.     The Coleman Family Murders

The KSO's murders of the Coleman Family occurred in October of 2004. Between July and October of that year, Kaboni made numerous phone calls to Kidada to discuss his concern that KSO member Eugene Coleman was cooperating with the police.[3] On October 8, 2004, Kaboni and Lewis briefly spoke over the phone, during which time Lewis expressed his fealty to Kaboni. Lewis then handed the phone over to Kidada. After the Savage siblings finished their conversation, Kidada told Lewis that Kaboni had ordered him to "firebomb the Colemans' house." (App. at 10985-86.) Kidada instructed that the firebombing should be done around 3:00 or 4:00 a.m. when "everybody is in the house," and she promised to give Lewis $5,000 for his efforts. (App. at 10986.)

Lewis enlisted Merritt to assist him, and early the next morning the two cousins set out to firebomb the Coleman family home. Before going to the Coleman house, Lewis and Merritt went to a local gas station, bought two gas cans, filled

---

[2] Lamont Lewis sold drugs for the KSO, which Lewis would "bag up" in Kaboni's basement. (App. at 10875, 10897.) Lewis entered into a plea agreement with the government in this case and testified as a government witness.

[3] Non-party Eugene Coleman also sold drugs for the KSO. He was known within the KSO to be non-violent. Coleman became a cooperating witness in a 2004 case against Kaboni, as discussed in more detail herein.

them with gasoline, and put them in the trunk of the car.  They then headed to Merritt's house in West Philadelphia to pick up a gun, but at approximately 4:08 a.m., a Philadelphia highway patrol officer pulled them over for speeding.  The officer was called to another scene, so he allowed them to leave and mailed Lewis the speeding ticket.

After getting the gun, Lewis and Merritt returned to North Philadelphia and parked around the corner from the Coleman house.  They removed the cans from the trunk, stuffed a cloth into one of the cans to serve as a wick, and carried the two cans to the house.  As they arrived at the front porch, Lewis gave Merritt a lighter, then he kicked in the front door, entered the house, and fired two shots.  Lewis heard a woman say, "Who's that?" when he kicked in the door.  (App. at 11002.)  Merritt immediately ran into the house and threw a lit gas can into the living room, causing a "big explosion." (App. at 11002).  He then exited the house and grabbed the unlit can and threw it into the house, too.  Lewis then left a message on Kidada's phone, saying "it was done."  (App. at 11003-04).

The following individuals were killed by the arson: Marcella Coleman, 54, Tameka Nash, 34, Sean Rodriguez, 15, Tajh Porchea, 12, Khadijah Nash, 10, and Damir Jenkins, 15 months.[4]

---

[4] Lewis received $2,000 and a bottle of PCP oil for killing the Coleman family.  Lewis complained to Kidada that she had not informed him that there were children in the home.  When Coleman learned that his family members were murdered, he entered the protection of the U.S. Marshals' Witness Security Unit.

After the Coleman family murders, the government obtained court orders to place a recording device near Kaboni's federal detention center cell and another in the detention center's visitation room to intercept conversations Kaboni had with his friends, associates, and other inmates. In the recordings of the conversations that followed, Kaboni made various vulgar and brazen statements expressing satisfaction with the deaths of the Coleman family; he also threatened to kill additional witnesses and their relatives. *See infra* n.19.

## B.     Procedural History

On May 9, 2012, a grand jury in the Eastern District of Pennsylvania returned the Fourth Superseding Indictment in this case, upon which the parties ultimately proceeded to trial. The three defendants here were charged as follows: Count One charged Kidada, Northington, and Merritt with RICO conspiracy; Counts Five and Seven charged Northington with murder in aid of racketeering for the deaths of Barry Parker and Tybius Flowers, respectively; Count Nine charged Merritt with conspiracy to commit murder in aid of racketeering; Counts Ten through Fifteen charged Merritt and Kidada with murder in aid of racketeering, one count for each of the six Coleman family members who perished in the fire; Count Sixteen charged Merritt and Kidada with retaliating against a witness; and Count Seventeen charged Merritt and Kidada with using fire in the commission of a felony.[5]

---

[5] Count Eight, which charged Northington with witness tampering, was dismissed prior to trial, by agreement with the government. Kaboni was charged on all counts (Counts Two, Three, Four, and Six pertained only to him).

On May 13, 2013, the jury found Kidada and Northington guilty of all the crimes with which they had been charged; the jury found Merritt guilty on the RICO conspiracy count but not guilty as to all other counts.

Northington's capital penalty phase for the Flowers murder, Count Seven, commenced on June 5, 2013. The jury unanimously sentenced Northington to life imprisonment on that count, and the District Court sentenced him to two additional, concurrent terms of life imprisonment for Counts One and Five. On February 21, 2014, the District Court sentenced Kidada to concurrent terms of life imprisonment on Counts One and Ten through Sixteen, and the Court imposed a consecutive ten-year sentence on Count Seventeen. On September 19, 2014, the District Court sentenced Robert Merritt to life imprisonment on Count One. All four defendants timely appealed.[6]

As noted earlier, we affirmed the jury's guilty verdict and the District Court's imposition of a capital sentence on Kaboni in a precedential opinion.[7] The following discussion

---

[6] Kaboni's penalty phase hearings began on May 21, 2013. On May 31, the jury unanimously sentenced him to death on all 13 capital counts (Counts 2-7 and 10-16). On June 3, the District Court imposed death sentences on those counts, and also sentenced him to life imprisonment on Count 1 and to ten-year terms of imprisonment on Counts 9 and 17.

[7] Among other things, we held that (1) the late appointment of a substitute capital-qualified counsel to represent Kaboni did not constitute a constructive denial of the

8

pertains to arguments raised by Kidada, Merritt, and Northington that we did not reach in our earlier opinion.

## II. DISCUSSION[8]

### A. The District Court did not abuse its discretion in refusing to grant Kidada a new trial based on a conflict allegedly held by one of her two attorneys.

Kidada asserts that she was denied her Sixth Amendment right to counsel because one of her attorneys,

---

right to counsel, *Savage*, 970 F.3d at 244-48; (2) a capital defendant does not have a statutory right to a jury drawn from the county of the offense, *id.* at 250-52; (3) the District Court did not clearly err in finding that African Americans were not underrepresented in the qualified jury wheel, *id.* at 255-62; (4) the District Court did not clearly err in finding that a preemptory strike by the government was not racially motivated, *id.* at 262-72; (5) any error in the District Court's transferred intent instruction was not plain, *id.* at 272-83; (6) the admission of victim-impact evidence at the penalty phase was not clearly erroneous, *id.* at 298-303; and (7) as a matter of first impression, it was not unfairly prejudicial at the penalty phase to admit color autopsy photographs of the firebombing, *id.* at 303-06.

[8] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

9

Christopher Phillips, was burdened by a conflict of interest.[9] Specifically, she argues that Phillips's representation violated her Sixth Amendment right to conflict-free counsel, that Phillips created a second conflict of interest by opposing her motion for a mistrial, and that it was per se reversible error for the District Court not to have immediately held an evidentiary hearing on the matter. Before considering those three arguments, we briefly provide an overview of the facts relevant to her claim.

On March 19, 2013, six weeks into trial, at an off-the-record conference, the government disclosed its receipt from the Philadelphia District Attorney's Office of an "assignment" document showing that Phillips, while working in that office as an assistant district attorney, had been assigned in October 2003 to prosecute Kaboni and a co-defendant, Anthony Mitchell, for the murder of Kenneth Lassiter.[10] (Answering Br. at 292.) This revelation raised the possibility of a conflict of interest, not only because Phillips had once been assigned to prosecute Kidada's brother, but also because the government

---

[9] Kidada was represented by both Phillips and co-counsel Teresa Whalen at trial. The indictment against Kidada gave notice of the government's intent to seek the death penalty against her, and the District Court appointed Whalen to serve as learned counsel in the capital case. Whalen was permitted to stay on the defense team when the case was de-certified as a capital case with respect to Kidada.

[10] After ordering the murder of government witness Tybius Flowers, Kaboni was acquitted in state court of the Lassiter murder. He was later convicted of both murders in this case.

in this case had charged the Lassiter murder as a predicate offense for the RICO conspiracy charge, and Phillips was tasked with defending Kidada as to that count.

To address the potential conflict, the government moved on April 5, 2013, for an evidentiary hearing. The District Court granted the motion and subsequently appointed separate counsel to represent the interests of Kidada and of Phillips with respect to the alleged conflict. Kidada's conflicts counsel then filed a motion for a mistrial on April 26, 2013. Instead of immediately holding an evidentiary hearing, the Court allowed the trial to continue uninterrupted, and the jury returned a guilty verdict against Kidada on May 13, 2013.

A few days after the jury returned its verdict, the District Court set a briefing schedule for the mistrial motion and scheduled a hearing for June 17, 2013. Phillips, through his conflicts counsel, filed a brief opposing the mistrial motion. At the hearing, he testified that he had no recollection of having been assigned to the Lassiter matter when he was appointed to represent Kidada. He further testified that he never reviewed the evidence in that case, met with witnesses, contacted the victim's family, or discussed the case with anyone. Indeed, nine days after Phillips was assigned to the Lassiter murder prosecution, the case was reassigned to another assistant district attorney.

The District Court denied Kidada's motion for a mistrial. In denying the motion, the Court credited Phillips's testimony about his lack of involvement in the prior case, found that Phillips's brief assignment to the Lassiter matter did not limit his ability to vigorously defend Kidada, and observed that Kidada had failed to demonstrate that she suffered any

11

prejudice because of Phillips's prior assignment to the Lassiter matter.[11]

Turning to the legal issues, we begin with Kidada's argument that it was per se reversible error for the District Court to wait until after the jury returned its verdict to hold a hearing on the alleged conflict of interest.[12] The Sixth Amendment guarantees a defendant the right to effective assistance of counsel, which includes "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

---

[11] We generally do not address conflict of interest claims on direct appeal. *United States v. Morena*, 547 F.3d 191, 198 (3d Cir. 2008) ("The rationale behind this practice is that collateral review allows for adequate factual development of the claim, especially because ineffective assistance claims 'frequently involve questions regarding conduct that occurred outside the purview of the district court and therefore can be resolved only after a factual development at an appropriate hearing.'") (quoting *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 133 (3d Cir. 1984)) (internal quotation marks omitted). Here, however, the District Court held a hearing on the issue, providing us with an adequate record for review.

[12] We review a district court's determination with respect to an alleged conflict of interest for an abuse of discretion. *United States v. Voigt*, 89 F.3d 1050, 1074 (3d Cir. 1996).

As the District Court explained, the potential conflict in this case came to light "six weeks after trial began, and after the case had already demanded a significant amount of time from jurors, the parties, counsel, witnesses, and the Court." (Kidada Supp. App. at 66 n.9.) The Court concluded that "[i]t would have made little sense to adjourn the trial to deal with this issue. The only reasonable course was to continue with the trial and address the conflict issue after the jury had reached its verdict." (Kidada Supp. App. at 66 n.9.)

We agree that the District Court's course of conduct was reasonable, and we reject Kidada's suggestion that the Sixth Amendment imposes a rigid, blanket requirement that a court halt trial proceedings to inquire into an alleged conflict.[13] Rather, what constitutes "adequate steps" will necessarily vary depending on the circumstances of each case. In an instance such as this, where the timing of a court's investigation is at issue, we will generally defer to the district court's judgment unless the objecting party can articulate prejudice and show that the court abused its discretion. *Cf. Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

Here, Kidada recognizes that the post-trial timing of the conflict hearing "reflected the court's concern about the time and expense that already had been incurred in connection

---

[13] Kidada cites several out-of-circuit cases to support that proposition, but those cases address circumstances in which the trial court failed to undertake any inquiry into an alleged conflict.

13

[with] this trial, which was a death penalty prosecution." (Kidada Opening Br. at 44 n.7.) Additionally, Kidada has never contested the fact that she was represented throughout her case by Phillips's co-counsel, Teresa Whalen, who was not burdened by an alleged conflict of interest. And finally, as discussed in more detail below, Kidada has failed to show prejudice. Considering the late stage at which the potential conflict was brought to the Court's attention, and that Kidada was represented by competent co-counsel throughout trial, we conclude that the Court took adequate steps in immediately appointing conflicts counsel and holding a post-trial hearing on the alleged conflict.

We next consider the merits of Kidada's allegation that Phillips's representation of her was infected by a conflict of interest. To prove a Sixth Amendment violation based on a lawyer's representation of another client, a defendant "must establish that an actual conflict of interest" existed. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). An "actual conflict of interest is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (internal quotation marks omitted). Examples include refusing to cross-examine a witness, failing to respond to inadmissible evidence, or failing to "diminish the jury's perception of a [co-conspirator's] guilt." *Cuyler*, 446 U.S. at 349.

The record indicates that during the nine days in 2003 when Phillips was an assistant district attorney assigned to the Lassiter matter, he took no action on that case. He did not even recall the assignment until the government brought the assignment memo to his attention six weeks into the Savage

14

trial. It is difficult, then, to imagine how Phillips's brief assignment to the Lassiter matter could have limited his ability to represent Kidada. More importantly, except for Phillips's opposition to Kidada's motion for a mistrial, which we discuss below, Kidada has not pointed to – either in briefing or oral argument – any concrete instance of prejudice resulting from Phillips's representation, and nothing in the trial record suggests that Phillips's interests ever diverged from hers. She has failed to establish an actual conflict of interest.

But that does not slow her protestations. She contends that the actual conflict standard is inapplicable here because, "in contrast to this case," the Supreme Court in *Cuyler v. Sullivan* applied the standard where "the trial court [was] never made aware of the conflict of interest." (Kidada Opening Br. at 31 n.5 (citing *Cuyler*, 446 U.S. at 349-50).) In other words, Kidada asserts that the actual conflict standard applies only when the defendant fails to raise an objection at trial. But our own precedent forecloses that narrow reading of *Cuyler*. In *Simon v. Government of the Virgin Islands*, we held that "[a] petitioner claiming a conflict of interest must prove (1) multiple representation that (2) created an actual conflict of interest that (3) adversely affected the lawyer's performance." 929 F.3d 118 (3d Cir. 2019) (internal quotation marks omitted). In all cases, then, the "critical inquiry is whether counsel actively represented conflicting interests." *Zepp*, 748 F.2d at 135 (internal quotation marks omitted).

Unable to identify any point where Phillips's interests diverged from her own with respect to a material factual or legal issue in the case, Kidada alleges that her "lead counsel secretly harbored an intention to take a position adverse to the interests of his own client, which he then did in filing his own

15

separate opposition to Kidada's motion for a mistrial." (Kidada Opening Br. at 25.) Specifically, she claims that Phillips subordinated her interests "by filing briefs through his own separate counsel attempting to vindicate his own conduct and opposing, and taking a position actually adverse to, his client's interests." (Kidada Opening Br. at 39.)

Phillips's opposition to Kidada's mistrial motion falls short of evincing an actual conflict. First, Phillips explained at the hearing that he opposed Kidada's motion because he felt compelled to correct a factual misrepresentation, namely, that he had obtained confidential information about the Lassiter matter while serving as an assistant district attorney, when in fact he had not. It was fully proper for Phillips to endeavor to correct a factual misrepresentation that could harm his professional reputation. Moreover, Philips, like all attorneys, has a "duty of candor toward the court[.]" *Rosales-Mireles v. United States,* 138 S. Ct. 1897, 1911 (2018). To have remained mute in the face of a false factual assertion that he was specially, if not uniquely, situated to address would have violated that duty.

Second, Kidada moved for a mistrial *after* the evidentiary portion of the trial had concluded and Phillips's substantive involvement at trial had all but ended. Phillips's co-counsel, Teresa Whalen, delivered the closing argument on behalf of Kidada. Accordingly, even if Phillips had created a prospective conflict of interest at the moment he opposed Kidada's motion for a mistrial, Kidada has not shown that their interests ever diverged before that point, and she cannot support her Sixth Amendment claim based on the bare allegation that Phillips "secretly harbored" an unexplained malintent. The actual prejudice standard requires more; it

16

requires, at a minimum, that the dissatisfied defendant produce *some* evidence of divergent interests as to a material factual or legal issue. And that is something Kidada has never done.

### B. The District Court did not abuse its discretion in denying motions to sever.[14]

Both Kidada and Northington filed motions to sever, seeking individual trials. They argued that severance was warranted because they were charged with only a subset of the crimes charged against Kaboni, and that the number of defendants and charges in the case would confuse the jury.

The District Court denied their severance motions in a comprehensive opinion, determining that "[t]he seventeen counts are manageable" for a jury in a single case. (Kidada Supp. App. at 25.) The Court reasoned that "the allegations in the Indictment with respect to each Defendant are clear," and that "[t]he jury will be able to compartmentalize the evidence against the various Defendants, particularly when provided with instructions by the Court." (Kidada Supp. App. at 41.) Kidada and Northington now appeal the denial of their severance motions.

As we have often observed, a defendant, properly joined with other defendants in a criminal indictment, has "a heavy burden in gaining severance." *United States v. Quintero*, 38 F.3d 1317, 1343 (3d Cir. 1994). We review for abuse of discretion a district court's denial of severance. *United States*

---

[14] We review a district court's denial of a severance motion for abuse of discretion, *United States v. Hart*, 273 F.3d 363, 369 (3d Cir. 2001), as more fully discussed herein.

*v. Hart*, 273 F.3d 363, 369 (3d Cir. 2001). But even when there has been such an abuse of discretion, we will reverse a conviction only if the appellant can show that the denial of severance caused him "*clear and substantial prejudice resulting in a manifestly unfair trial*," and it is insufficient "merely to allege that severance would have improved his chances for acquittal." *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991) (quoting *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981)).

In assessing whether a defendant has suffered clear and substantial prejudice, the key inquiry is "whether the jury could have been reasonably expected to compartmentalize the allegedly prejudicial evidence in light of the quantity and limited admissibility of the evidence." *United States v. De Peri*, 778 F.2d 963, 984 (3d Cir. 1985). We will not find prejudice "just because all evidence adduced is not germane to all counts against each defendant," or because certain defendants are "seemingly less culpable," or because evidence is "more damaging to one defendant than others." *Eufrasio*, 935 F.2d at 568.

In short, the bar is high and reflects the "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). A joint trial promotes efficiency, avoids inconsistent verdicts, *id.*, permits fact finders to assess the "full extent of [a] conspiracy," *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir. 1982), *abrogated on other grounds by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 372 (3d Cir. 2010), and prevents "the tactical disadvantage to the government from disclosure of its case." *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981).

18

Kidada and Northington contend that, because they were charged with only a subset of the 12 murders instigated by Kaboni in furtherance of the RICO enterprise, and due to the complexity of the case, they were prejudiced by the spillover of emotion evoked by evidence of crimes they didn't commit.[15] But, as an initial matter, Kidada and Northington cannot show clear and substantial prejudice by simply pointing to the fact that the government introduced evidence pertinent to other defendants. Were that the case, "a joint trial could rarely be held." *United States v. Dansker*, 537 F.2d 40, 62 (3d Cir. 1976), *abrogated on other grounds by Griffin v. United States*, 502 U.S. 46, 57 n.2 (1991). Rather, as explained above, the lodestar of the prejudice inquiry is "whether the evidence is such that the jury cannot be expected to compartmentalize it and then consider it for its proper purposes." *Id.* (internal citations omitted). That showing is absent here. We have repeatedly affirmed convictions of defendants who were jointly tried alongside co-defendants charged with more serious or additional crimes, so long as the jury could compartmentalize the evidence. *See, e.g.*, *United States v. Walker*, 657 F.3d 160, 168-71 (3d Cir. 2011) (affirming denial of severance where two brothers were charged with the same six crimes and only one of the brothers was charged with two additional but related crimes); *United States v. Sandini*, 888 F.2d 300, 304-07 (3d Cir. 1989) (affirming denial of severance where one conspirator was charged with a more serious

---

[15] As a reminder, Kidada abetted the murders of the six Coleman family members. Northington, for his part, participated in the murders of Barry Parker and Tybius Flowers.

19

continuing criminal enterprise offense); *United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir. 1985) (affirming denial of severance where three defendants were charged with multiple robberies, even though one defendant complained that shots were fired only in robberies with which he was not charged, and even though two of the three defendants made incriminating statements to the police).

More particularly as to compartmentalization, Kidada and Northington have not demonstrated why the jury was incapable of managing the evidence here. Although they describe the volume of evidence introduced by the government against their codefendants, they do not dispute that the Court instructed the jury to consider the charges against each defendant separately. And, of course, we presume that the jury will follow limiting instructions and will be able to appropriately analyze the evidence and issues. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions."); *United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005) ("We presume that the jury follows such [limiting] instructions, and regard such instructions as persuasive evidence that refusals to sever did not prejudice the defendant.") (internal citation omitted).

The verdicts in this case reinforce the soundness of that presumption because they show that the jury thoughtfully differentiated the crimes committed by the defendants, yielding some not-guilty verdicts and, in Northington's case, sparing his life. For example, the jury found that the government failed to prove that Kidada, Northington, or Merritt were involved in a drug conspiracy involving quantities that would have subjected them to higher statutory penalties. To take another example, the jury found that the government

20

proved that Kaboni and Kidada engaged in witness retaliation by killing the Coleman family members, but they found that the government failed to meet its burden of proof as to Merritt. By the same token, the jury found Merritt not guilty of substantive counts related to the murders but convicted the Savage siblings as to those counts. And finally, in a separate seven-day penalty proceeding, the jury unanimously sentenced Northington to life in prison after having sentenced Kaboni to death.

The jury's ability to thoughtfully differentiate among the defendants undermines Northington's assertion that, considering the "graphic" and "profane" evidence against Kaboni, the jury would necessarily find him "equally culpable." (Northington Opening Br. at 70-71.) On the contrary, it is possible that Northington and Kidada benefited from being tried alongside Kaboni, as it may have been apparent to the jury that they were relatively less culpable than he was and should be treated accordingly.[16]

Finally, Kidada asserts that "[t]he prejudice against [her] was further heightened by the fact that she was tried by a death-qualified jury as the only defendant who was not facing the death penalty." (Kidada Opening Br. at 77.) But the Supreme Court has specifically rejected that type of argument. *See Buchanan v. Kentucky*, 483 U.S. 402, 420 (1987)

---

[16] We are not suggesting that a severance motion should be decided one way or another on a "next to him you're a saint" rationale, although extreme differences in culpability could be a consideration. We are, however, observing that, in this case, the District Court's anticipatory assessment of the jury's capability proved to be accurate.

(petitioner was not deprived of his Sixth Amendment right to an impartial jury because the prosecution was permitted to "death-qualify" the jury to address co-defendant's exposure to the death penalty). A death-penalty-qualified juror, like any other, is expected to follow the court's instructions, presume every defendant is innocent until proven guilty, and not vote to convict except upon proof beyond a reasonable doubt. The jurors here clearly did so.

The District Court did not abuse its discretion in denying the motions to sever in this case.

## C. The District Court did not impermissibly admit statements made by Kaboni against Kidada and Merritt.[17]

Kidada argues that the District Court improperly admitted certain inflammatory comments by Kaboni.[18] She asserts that the comments, which were admitted as co-conspirator statements, were not made in furtherance of a conspiracy, that the District Court erred by failing to issue a contemporaneous limiting instruction, and that the comments were highly prejudicial. Before addressing her arguments, we provide a sampling of those deeply disturbing statements and describe what transpired at trial.

---

[17] We review the District Court's decision regarding the admissibility of evidence for an abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

[18] Merritt adopts Kidada's argument in full, without presenting any additional analysis.

22

In pretrial motions, Kaboni moved to preclude wiretap recordings of things he said to fellow inmates. In those conversations, Kaboni made numerous damning admissions, telling of his delight with the Coleman murders and expressing his intent to kill law enforcement officials and other witnesses. The District Court allowed the government to introduce most of those recordings.

We decline to catalogue all his heinous statements and instead provide three examples in the footnote below, to illustrate their shocking character.[19] Because Kaboni did not

---

[19] In one instance, Kaboni complained to a prisoner in an adjoining cell about having missed his daughter's eighth grade graduation, stating, "[t]hat's why [they] got to pay … Those … rats." (App. at 1306.) Kaboni continued, "Their kids got to pay, for making my kids cry. I want to smack one of their four-year-old sons in the head with a bat …. Straight up. I have dreams about killing their kids ... [c]utting their kids' heads off." (App. at 1306-07.) In another statement to the same prisoner, Kaboni stated, "Yo. Can you imagine [Coleman's] face, man .... When that news flash or that captain went and got him. They didn't tell him we got some good news and we got some bad news. They said we got some bad news …. (Laughs) It don't stop. Just put[,] just put etcetera after the word dead." (App. at 1384.) And Kaboni bragged to another prisoner that Coleman "couldn't view" the bodies of his family members because they had been burned in the fire. Kaboni said, "They shoulda, you know where they shoulda took him? They should took him got, got some barbeque sauce and poured it on them[.]" (App. at 1144.)

appeal the admissibility of the recordings, we did not directly address in our prior opinion whether they were admissible. We did observe, however, that the recordings "demonstrated [Kaboni's] complicity in the Coleman firebombing. They also revealed [his] great satisfaction that the killings had taken place, and the intercepted conversations revealed plans to kill yet other witnesses and their families." *Savage*, 970 F.3d at 235.

At trial, Kidada's counsel requested a limiting instruction as to the statements that Kaboni made to other prisoners, arguing that the prisoners were not co-conspirators and Kaboni's statements to them were not made in furtherance of the conspiracy and therefore were not admissible against her. The District Court admitted the recordings and declined to give a contemporaneous limiting instruction.

The District Court did, however, instruct the jury as to both co-conspirator liability and the Kobani recordings in its jury charge. It explained that the jury could

> consider the acts and the statements of any other member of the conspiracy during and in furtherance of the conspiracy as evidence against a defendant whom you have found to be a member of the conspiracy. When persons enter into a conspiracy, they become agents for each other, so that the acts and the statements of one conspirator during the existence of the conspiracy and in furtherance of the conspiracy

24

are considered the acts and statements of all other conspirators and are evidence against them all.[20]

---

[20] The District Court also instructed:

> [T]he acts or statements of any member of a conspiracy are treated as the acts and statements of all members of the conspiracy if these acts and statements were performed or spoken during the existence of the conspiracy and to further the objectives of the conspiracy. Therefore, ladies and gentlemen, you may consider as evidence against a defendant any act or statement made by any member of the conspiracy during the existence of the conspiracy and to further the objectives of the conspiracy. You may consider these acts and statements, even if they were done or made in the absence of that defendant and without that defendant's knowledge at all. As with all of the other evidence presented, ladies and gentlemen, in this case, it is for you to decide whether you believe this evidence and how much weight you will give it. So, ladies and gentlemen, the acts and the statements of a conspirator in furtherance of the conspiracy are the acts and statements of all members of the conspiracy.

(App. at 15147-48.)

25

(App. at 15154-55.)

As to the cell block recordings, the District Court specifically reminded the jury that it had "heard tape recordings of things that certain defendants said," which included "foul or offensive language" or "disturbing statements." (App. at 15122.) The Court then cautioned that this evidence was admitted for "limited purpose[s]," and could be considered "only for the purpose of deciding whether the defendant had the state of mind, knowledge or intent necessary to commit the crimes charged in the indictment," and not as "proof that the defendant has a bad character or a propensity to commit crimes." (App. at 15122-23.) Further on, the Court also instructed the jury that it "must separately consider the evidence against each offense charged[.]" (App. 15127.) Notably, Kidada neither requested supplemental instructions, nor raised any objections to the District Court's final instructions.

Kidada makes several arguments regarding the cell block recordings introduced at trial. She first argues that "[t]he district court admitted the recordings as co-conspirator statements, under Federal Rule of Evidence 801(d)(2)(E), and over the repeated objections of defense counsel." (Kidada Opening Br. at 45.) Because the conversations were not in furtherance of the conspiracy, she says "the district court abused its discretion in admitting" the conversations between Kaboni and non-members of the conspiracy, some of which

"were played multiple times to the jury." (Kidada Opening Br. at 47-51.)

That argument misses the mark because the District Court did not ultimately admit the cell block recordings against Kidada under the co-conspirator hearsay exception. Rather, the Court admitted them against Kaboni alone because they were highly probative of his guilt and not sufficiently prejudicial to outweigh their probative value. Indeed, the Court in its final instructions cautioned the jury that it should consider the recorded conversations introduced at trial only in assessing whether the defendant who made the statements had the state of mind, knowledge, or intent necessary to commit the charged crimes and not for any other purpose.

Kidada next argues that, notwithstanding the final jury instructions, the District Court erred because it "did not clarify for the jury which of the hundreds of recordings the government had introduced at trial they could consider in assessing Kidada's guilt." (Kidada Opening Br. at 58.) More specifically, Kidada argues that the Court erred because it "did not at any time" tell the jury that "the cell block recordings were admissible against Kaboni alone." (Kidada Opening Br. at 58.) In support, she cites *Zafiro*, 506 U.S. at 539, in which the Supreme Court recognized that a joint trial of co-defendants may carry the risk of a jury being unable to make a reliable judgment about guilt or innocence "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant."

While it may have been the better course to give a contemporaneous limiting instruction regarding the jailhouse

27

recordings, we cannot say that the District Court abused its discretion in declining to do so. It sufficiently cautioned the jury in its final instructions, directing the jury to consider the recorded conversations only in assessing whether the defendant who made the statements – Kaboni – had the state of mind, knowledge, or intent necessary to commit the charged crimes and not for any other purpose. Further, both Kidada and Merritt must have regarded those instructions as adequate, since neither requested supplemental final instructions or raised any objections to the District Court's final instructions.

As for Kidada's argument on appeal that the District Court "did not clarify, at any time during the trial or in its final charge to the jury which of the hundreds of recordings the government had introduced at trial were admissible against which of the four co-defendants," (Kidada Opening Br. at 76), the District Court need not have supposed that the jury would fail to follow the instructions it received. Moreover, if Kidada was concerned that the jury would hold her accountable for Kaboni's comments to others, her counsel was free to address that issue in closing argument. Her counsel did not mention the cell block statements in closing, however, which makes sense, as they were irrelevant to the government's case against her. The government, for its part, never suggested in its closing argument that the recordings had relevance to Kidada's guilt.

Finally, Kidada contends that the cell block recordings were overwhelmingly prejudicial to her because, in her view, the government's "case against [her] … was focused on linking her with her brother['s] activities" and "clearly would have been materially less compelling without the recordings of Kaboni[.]" (Kidada Opening Br. at 61.) Kidada asserts that "there can be no sure conviction that the guilty verdicts against

28

Kidada would have been returned in the absence of the overwhelming amount of uniquely and unfairly prejudicial hearsay that the government introduced at trial in the form of Kaboni's cell block recordings."[21] (Kidada Opening Br. at 60.) This argument falls flat. Her own inculpatory correspondence with Kaboni, the testimony of witnesses such as Lamont Lewis, and a threatening letter[22] from Kidada to Coleman provided the jury with a more than sufficient evidentiary basis to establish her participation in the Coleman family murders and in the affairs of the KSO.

For those reasons, the District Court did not abuse its discretion in admitting the cell block recordings and declining to give a contemporaneous limiting instruction.

**D.     The District Court did not abuse its discretion in denying Northington's motion for a mistrial.**

Northington next argues that he is entitled to a mistrial because the prosecutor identified him as one of the perpetrators

---

[21] (*See also* Kidada Opening Br. at 61 ("The government's case against Kidada, which was focused on linking her with her brother['s] activities, clearly would have been materially less compelling without the recordings of Kaboni, to whom – as the government portrayed it – she was particularly devoted.")).

[22] Kidada wrote to Coleman: "Death before dishonor … to your family.  If you said something, let us know.  If you didn't, let us know.  We have to know what's going on.  Don't say shit to nobody."  (App. at 8946.)

of the Coleman family firebombing during closing arguments, even though he was not charged with committing that crime. Because the District Court immediately cured any error, we conclude that it did not abuse its discretion in denying Northington's motion for mistrial.

During closing arguments, the government summarized the Coleman family murders. Northington's three co-defendants were charged with those murders, but Northington was not. The AUSA concluded the government's closing argument, however, by pointing at the defendants and repeating, "you killed them." (App. 14396.) The transcript of the proceeding in the jury's presence reads as follows:

> **AUSA**: There were six beautiful, healthy, loving people in that house and you killed them. You killed them, and you killed them, and you killed them.

> **Counsel**: Objection. We are not charged with that arson.

> **AUSA**: I was not pointing at Mr. Northington.

> **Court**: That is true.

> **AUSA**: You know who killed them. Kaboni Savage, Kidada Savage, Robert Merritt and Lamont Lewis.

(App. at 14396-97.)

After the AUSA completed the government's closing argument, a sidebar was held, at which time Northington moved for a mistrial based on the prosecutor's having pointed at him. The District Court denied the motion and stated the following: "I will instruct the jurors when they come back that Mr. Northington is not charged with that crime and they are not to consider him as being charged with that crime." (App. at 14399.) The District Court then instructed, "[m]embers of the jury, just one clarification for you. Ladies and gentlemen, you should understand that Steven Northington is not charged with any of the Coleman arson murders. Okay? He is not charged with those crimes." (App. at 14400.)

We review a denial of a motion for a mistrial for an abuse of discretion. *United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007). When a motion for a mistrial is based on a prosecutor's remarks in a closing statement, we first determine whether the prosecutor's remarks were improper. *United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995) (en banc). If the remarks are improper, as they seem to have been in this case,[23] "we will go on to weigh the remarks under a

_____

[23] Indeed, it seems odd for the AUSA, with an endorsement from the Court, to disclaim having pointed at Northington when there were only four defendants and the "you killed them" declaration was made four times. But, as the punctuation in the transcript indicates, it is possible that the statement was made once as to the three culpable defendants collectively and then was repeated as the prosecutor pointed to each of them individually. In any event, the government does not now dispute the misidentification. (*See* Answering Br. at 364 ("Mistakenly, and inadvertently, the prosecutor also

31

harmless error standard." *Id.* In determining whether improper remarks were harmless, we consider "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction." *Id.* at 1265. Here, all three factors support a finding that Northington was not prejudiced.

First, as the government points out, "the challenged statement consisted of one sentence comprising just two lines in a closing argument that spanned two days, and 277 pages of transcript." (Answering Br. at 366.) *See Zehrbach*, 47 F.3d at 1260, 1267 (finding no prejudice when challenged remarks regarding prosecutor's view of credibility and guilt of two witnesses were two sentences in a closing argument that filled 40 pages of transcript); *United States v. Homer*, 545 F.2d 864, 868 (3d Cir. 1976) (finding no prejudice when questionable comments regarding sending a message to the public and other corrupt officials constituted two paragraphs in 60 pages of closing argument). Thus, in the context of two days of closing arguments – let alone a 10-week trial – the AUSA's mistake was relatively fleeting.

Second, the District Court effectively cured any effect of the brief misstatement and hand gesture. Moments after the AUSA pointed at Northington, the District Court reminded the jury that Northington was not charged in the Coleman family murders. A jury is presumed to follow a court's instruction to disregard inadmissible evidence inadvertently presented to it,

---

pointed at Northington and, without using Northington's name, repeated the phrase[: 'and you killed them.'"]).)

32

"unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citation omitted). In addition to the District Court's specific and immediate instructions, the Court also instructed the jury at the close of the case that the comments of counsel, such as closing arguments, are not evidence.

And third, the jury heard overwhelming evidence in support of the government's racketeering conspiracy count and two murder counts against Northington, including extensive firsthand evidence of Northington's membership in the KSO and his participation in the murders of Barry Parker and Tybius Flowers.

In short, the government's error was harmless, and the denial of Northington's motion for a mistrial was no abuse of discretion.

### E.  The District Court properly admitted evidence seized from Northington's residence.

Northington next argues that the District Court clearly erred in admitting evidence seized from his residence pursuant to a search warrant that he contends was inaccurate and misleading.[24]  Before addressing that argument, we describe

---

[24] "We review for clear error a district court's determination regarding whether false statements in a warrant application were made with reckless disregard for the truth. … [A]fter putting aside any false statements made [knowingly and deliberately or] with reckless disregard for the truth, we

the events that led the police to apply for a warrant to search Northington's residence, the contents of that warrant, and the District Court's ruling on the admissibility of the evidence seized pursuant to the warrant.

### 1. Barry Parker's murder and the warrant to search Northington's residence

Northington, who lived at 3908 North Franklin Street, sold crack for the KSO near his home. When rival drug dealer Barry Parker encroached on his turf, Northington complained to Kaboni, who told him to "handle [his] business." (App. at 8849-53, 10846.) The import of that statement in the violent context of the KSO was clear.

Lamont Lewis, whom Kaboni had recruited to assist Northington in killing Parker, testified that on February 26, 2003, he and Northington were circling the 3900 block of North Franklin in Northington's car, searching for Parker. When Northington spotted Parker on the corner of Franklin and Luzerne Streets, he parked his car nearby. Lewis then left the car, walked up to Parker, and shot Parker three times in the chest, killing him.

Soon after the killing, Detective Kenneth Rossiter arrived on the scene and interviewed witnesses. Based on those interviews, Detective Rossiter prepared a warrant application and supporting affidavit to search 3908 North

---

review de novo a district court's substantial-basis review of a magistrate judge's probable cause determination." *United States v. Desu*, 23 F.4th 224, 235 (3d Cir. 2022).

Franklin Street. The warrant application sought authorization to search the premises for evidence of murder, including guns, ammunition, a black baseball cap, black jackets, black jeans, and any contraband.

Detective Rossiter's affidavit contained three key pieces of information. First, Parker's mother was walking west on Luzerne Street toward 7th Street when she saw two men whom she knew to be Northington and Northington's younger brother, Allen, crouching behind a car, while Northington had a gun in his hand. Second, when the victim's mother heard gunshots, she walked toward the scene of the shooting and observed the Northington brothers run into 3908 North Franklin Street. She told officers what she had seen, and they checked the premises for armed men.[25] And third, the victim's nephew, E.G., reported that, at the time of the shooting, he was standing with Parker on the corner of Franklin and Luzerne Streets when a black man wearing a black leather jacket, black jeans, and a black baseball cap approached Parker and shot him three times in the chest. E.G. reported that the shooter then fled south on Franklin Street.

During the search undertaken pursuant to the warrant, police seized multiple handguns, ammunition, cocaine, and drug paraphernalia from Northington's house.

## 2. Northington's suppression motion

Northington filed a motion to suppress the seized evidence, asserting that the police filed a misleading warrant

---

[25] A SWAT unit secured the apartment until a search warrant was obtained.

application in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). He made two arguments before the District Court in support of his motion, both of which he raises again on appeal. First, he notes that, in E.G.'s statement to the police, which was given shortly after the shooting, E.G. reported that the shooter "took off running down Luzerne Street toward 8ᵗʰ Street," as opposed to fleeing south on Franklin Street, as Detective Rossiter's affidavit stated. (Northington Br. at 66-67 (quoting Supp. App. at 147).) Northington says that Detective Rossiter misstated E.G.'s observation to obscure the fact that the shooter was actually running away from, and not toward, 3908 North Franklin Street. Second, Northington argues that Detective Rossiter's affidavit omitted that E.G. knew Northington but "indicated clearly in his statement that [Northington] was not the shooter of Barry Parker." (Northington Br. at 67.) According to Northington, those omissions deceived the magistrate who issued the warrant "into believing that [Northington] or his brother [was] the gunmen," creating the illusion of probable cause. (Northington Br. at 67.)

The District Court rejected those arguments. While acknowledging that Detective Rossiter's affidavit misreported E.G.'s statement as to the direction in which the shooter ran, the Court concluded that Northington had not introduced any evidence to suggest that the error was knowing or reckless, as opposed to merely "inadvertent." (Supp. App. at 166.)[26] In any event, the Court observed that the mistake was immaterial because the victim's mother's account was also included in the warrant application, and she reported having seen Northington

---

[26] Supp. App. Refers to the Supplemental Appendix of Appellee, United States of America.

enter his Franklin Street residence after the shooting. (Supp. App. at 166.)

As to Northington's claim that Detective Rossiter deceived the magistrate by omitting the fact that E.G. knew Northington but did not recognize the shooter, the District Court explained that this claim "misreads" the warrant application because "[a]t no point does the warrant application identify [Northington] as the shooter." (Supp. App. at 166.) Instead, "the warrant implicates [Northington] in the murder due to … [the] positive identification [by the victim's mother of Northington] as having been at the scene of the murder, with a gun in his hand, and then placing him inside 3908 North Franklin after the shooting." (Supp. App. at 166-67.)

To succeed on a *Franks* claim, a defendant must prove by a preponderance of the evidence that the affiant knowingly and deliberately, or with reckless disregard for the truth, included a falsehood or omission in the warrant application, and he must prove that the resulting false statement was material to the probable cause determination. *Franks*, 438 U.S. at 171-72. In assessing materiality, the court excises the erroneous information, inserts the missing information, and then determines whether the "reformulated affidavit established probable cause." *United States v. Yusuf*, 461 F.3d 374, 383-84, 390 (3d Cir. 2006).

Northington fails on both prongs of the *Franks* test. First, as the District Court correctly observed, Northington has not pointed to any evidence to suggest that the affidavit in question was knowingly or recklessly false. And second, any omissions or misrepresentations were indeed immaterial to the probable cause determination. While it seems that E.G. did not

37

recognize the shooter, the warrant application did not identify Northington as the shooter. Additionally, even if E.G.'s observations concerning the identity of the shooter and the direction in which he ran were omitted from Detective Rossiter's affidavit, the affidavit would nonetheless establish probable cause because it also contained the report of the victim's mother, who identified Northington as having been at the scene of the murder with a gun in his hand and as having entered his residence at 3908 North Franklin soon thereafter.

Accordingly, we conclude that the District Court did not clearly err in finding that any misstatements or omissions in Detective Rossiter's affidavit were inadvertent, and that, even excluding E.G.'s account, the affidavit contained a sufficient basis for the magistrate's probable cause determination.

## F. The District Court did not abuse its discretion in admitting at trial evidence of the circumstances of Northington's arrest.

Before trial, the government gave notice to Northington of its intention to introduce evidence found during his 2004 arrest on a federal warrant, asserting that it was admissible intrinsic evidence of the existence of the charged RICO conspiracy. The government also asserted that, even if the District Court deemed the evidence to be extrinsic of bad acts beyond the conspiracy evidence, it was nevertheless admissible under Federal Rule of Evidence 404(b).[27]

---

[27] "We review the District Court's decision to admit evidence under Rule 404(b) for an abuse of discretion, which 'may be reversed only when clearly contrary to reason and not

38

(Northington Supp. App. at 18 (citing Fed. R. Evid. 404(b)(2)).) The District Court admitted the evidence over Northington's objection.

Here is the backstory on that earlier arrest. On September 8, 2004, while Northington was driving with his cousin in a rental vehicle approximately two miles from the Coleman residence, he was pulled over by Philadelphia police officers. When the police asked him to identify himself, Northington, who was "dressed in Muslim garb," provided "one of his multiple false names." (Northington Br. at 18.) One of the officers recognized Northington, however, and he was arrested on a federal warrant. The officers subsequently found a loaded handgun, a full can of gasoline, and a bag of latex gloves in the car.

The government argued in a motion in limine that the circumstances of Northington's arrest were intrinsic evidence of his involvement in the charged RICO conspiracy.[28]

---

justified by the evidence.'" *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001) (internal quotation marks omitted).

[28] The indictment alleged that Northington had been a member of the KSO since 1997, and that the KSO used violence and intimidation to maintain its drug trafficking operations and to intimidate or retaliate against potential witnesses. The indictment charged that KSO members committed murders to further the aims of the KSO, and that Northington participated in two such murders: the murder of rival drug dealer Barry Parker in 2003, and the murder of Tybius Flowers in 2004, to prevent Flowers from testifying in Kaboni's state trial for the murder of Kenneth Lassiter.

Specifically, the government argued that the circumstances of Northington's arrest would allow the jury to conclude that Northington intended to firebomb the Coleman home, but that his arrest prevented him from doing so. In support of that theory, the government sought to also introduce a recording of a June 4, 2004, phone conversation between Kidada and Kaboni, in which Kaboni ordered Kidada in coded language to instruct Northington that he "better go ahead" and "to get on that."[29] (Northington Supp. App. at 40-41.)

Northington filed a motion to preclude the evidence on the grounds that he was not charged with the Coleman family murders, that the government's theory was speculative, and that the evidence would be unfairly prejudicial to him.

The District Court admitted the evidence, reasoning that the circumstances of Northington's arrest tended to directly prove the charged RICO conspiracy and so the evidence was intrinsic to the charge. The Court further determined that, even if the evidence was not intrinsic to the charged conspiracy, it was admissible under Rule 404(b) because it showed the relationship between the co-defendants, the nature and background of the conspiracy, the motive and intent for retaliating against government witnesses, and a specific

---

Northington was not charged with the firebombing and murder of the Coleman family that ultimately took place a month after his 2004 arrest.

[29] Immediately before speaking with Kidada, Kaboni was speaking with KSO affiliate Raymond Wilmore, to whom Kaboni stated, "Oh, well tell [Kidada] he better go ahead man." (Northington Supp. App. at 40.)

40

method of retaliation. Finally, the Court conducted a Rule 403 analysis. It determined that the evidence was highly probative of the existence of, and Northington's participation in, a RICO conspiracy, and that the probative value of the evidence was not substantially outweighed by a risk of unfair prejudice.

While "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with [his] character[,]" Fed. R. Evid. 404(b)(1), that rule "does not apply to evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense." *United States v. Gibbs*, 190 F.3d 188, 217 (3d Cir. 1999). Intrinsic evidence is evidence that directly proves the charged offense, or that constitutes "uncharged acts performed contemporaneously with the charged crime … if they facilitate the commission of the charged crime." *United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) (internal quotation marks omitted).

Northington argues that the evidence relating to his September 2004 arrest is not intrinsic to the case against him because the government did not charge him with any acts relating to the Coleman killings. That argument is unavailing because, as the District Court observed, the indictment charged that the KSO used acts of intimidation and retaliation to maintain and further the objectives of the KSO, that murders were committed for this purpose, and that Northington committed two such murders. Accordingly, evidence that Northington endeavored to firebomb the Coleman home would be highly probative of his participation in the charged RICO conspiracy, as it would show unity of purpose and his commitment to the KSO's objectives.

41

Northington's other argument, that the evidence was not capable of supporting a finding that he attempted to firebomb the Coleman residence, is more compelling. First, Northington points out that the June 20, 2004 phone call took place three months before his arrest, and yet the government cannot account for the delay between Kaboni's supposed order and when Northington undertook to carry out the order. Second, Northington contends he was not implicated in the June 20, 2004 recorded phone call. During that call, Kaboni told Kidada that an individual called "Money Sign" had "better get on that." (Northington App. at 40.) But neither the indictments nor any of the discovery materials attribute the moniker "Money Sign" to Northington. Moreover, the lead investigator testified before the federal grand jury and later at trial that he did not know who "Money Sign" was. Third and relatedly, Northington notes that Kaboni never explicitly explained what "Money Sign" was supposed to do. (Northington Br. at 27 ("Was [Money Sign] supposed to collect a debt? Sell Drugs? Pay a visit to the prison …. There exist an incalculable number of possibilities.").) Finally, Northington objects to the inference drawn by the government because he was arrested approximately two miles from the Coleman residence, was traveling in the opposite direction of that house, and was closer to his own home than to the Colemans'.

In further support of his argument that the government's theory "was unadulterated speculation," Northington argues that "[i]f the Government legitimately believed that [he] had taken substantial steps to firebomb the Coleman family," surely his acts on September 8, 2004 would have been listed as predicate acts in the 140-paragraph RICO conspiracy count and as a separate count charging him with attempted murder.

(Northington Br. at 26, 32.) Northington also notes that the government's witness list included Raymond Wilmore, through whom Kaboni supposedly gave Kidada the go-ahead to order the firebombing, but the government "opted not to call Willmore as a witness to either confirm or deny that 'Money Sign' was [Northington]." (Northington Br. at 30.)

As the above demonstrates, Northington has reasonable grounds for arguing that the evidence involving his arrest, and the phone call made three months earlier, fail to support a finding that he attempted to firebomb the Coleman family home. Of course, it is not for us to decide whether the evidence establishes that Northington was en route to murder the Colemans. Rather, the question is whether the District Court abused its discretion in admitting the evidence.

The government's theory, although circumstantial and vulnerable to critique, is plausible. As the District Court observed, the police arrested Northington in the vicinity of the Coleman residence, he gave a false name to the police, and he possessed materials to carry out a firebombing. And, although there is scant evidence directly linking Northington with the moniker "Money Sign," he did go by a similar alias: "Dollar Bill." The record indicates that Kaboni was adamant that "Money Sign" fulfill an unknown order, and considering Kaboni's preoccupation with retribution against Coleman, a jury could reasonably conclude that the unspoken order was to go through with the Coleman killings. Finally, the KSO ultimately killed the Coleman family members by throwing a lit can of gasoline into their home, so a jury could conclude that, under the circumstances, it was no coincidence that Northington possessed materials that would enable him, a well-

43

known KSO member, to carry out the killing at Kaboni's behest.

Based on those proffered facts, a jury could reasonably conclude that the evidence relating to Northington's arrest showed that he intended to firebomb the Coleman home. We also decline to disturb the District Court's ruling that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. We generally will not reverse a district court's Rule 403 decision unless the "analysis [undertaken] and resulting conclusion" is "arbitrary or irrational." *United States v. Kellogg*, 510 F.3d 188, 197 (3d Cir. 2007); *see also id*. (noting that if "judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal" (citation and internal quotation marks omitted)).

Rule 403 guards against "unfair" prejudice, that is, prejudice "based on something other than [the evidence's] persuasive weight." *United States v. Bergrin,* 682 F.3d 261, 279-80 (3d Cir. 2012) (citation omitted). Unfair prejudice "does not simply mean damage to the opponent's cause" but is "prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found." *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (quoting *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002)).

It was not arbitrary or irrational for the District Court to conclude that the evidence was not unfairly prejudicial. While the government argued at trial that the evidence relating to Northington's arrest supported an inference that he was willing

to carry out the firebombing, and that he was therefore acting in furtherance of a conspiratorial objective, Northington was not charged with the Coleman murders. Additionally, Northington strenuously opposed the government's view of the evidence in his closing argument, attacking each link in the government's chain of logic. The jury therefore had the information it needed to sift through the evidence and resolve whether or not to draw the inference that Northington attempted to carry out the firebombing.

Finally, in light of the credible and extensive testimony implicating Northington in the murders of Barry Parker and Tybius Flowers, we conclude there was little risk that the evidence relating to Northington's arrest would cause the jury to convict Northington for those murders on an improper emotional basis rather than on the evidence presented at trial.

In sum, because we agree with the District Court that a jury could reasonably conclude that the evidence relating to Northington's arrest would allow the jury to conclude it was more likely than not that Northington intended to firebomb the Coleman home,[30] and because the Court's Rule 403 ruling was

---

[30] When dealing with issues of relevance based on conditional facts, Federal Rule of Evidence 104(b) requires courts to examine the proffered evidence and determine whether a jury could reasonably find the conditional fact by a preponderance of the evidence. *Huddleston v. United States*, 485 U.S. 681, 689-90 (1988) (citing Fed. R. Evid. 104(b)). "Evidence is reliable for purposes of Rule 404(b) 'unless it is so preposterous that it could not be believed by a rational and properly instructed juror.'" *Bergrin*, 682 F.3d at 279 (quoting *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008), in

not arbitrary or irrational, we conclude that the District Court did not abuse its discretion in admitting the evidence. Because we hold that the admitted evidence was intrinsic to proving Northington's involvement in the RICO conspiracy, we do not reach the District Court's ruling that the evidence was also admissible under Rule 404(b).

### G. The District Court did not clearly err in overruling Northington's *Batson* challenge.[31]

Northington alone challenges the government's peremptory strike of Juror #364, whom Northington contends was struck because of her race. Juror #364 identified herself as a 46-year-old African-American woman who has a 26-year-old son, and who works as a business analyst. In response to a juror questionnaire, she provided answers that raised concern for the government. First, she stated that her residence was burned in a fire. Second, she reported that, five years earlier, her son was shot three times while sitting in his car, which

---

the form of a parenthetical). As a reminder, the evidence relating to Northington's arrest included that he was near the Coleman family home, that he had a loaded handgun, a full can of gasoline, and a bag of latex gloves in the car, and that Kaboni had ordered a person called "Money Sign" – similar to Northington's alias, "Dollar Bill" – to "go ahead" and "get on that."

[31] A district court's determination of whether a prosecutor harbored discriminatory intent in striking a juror is a "pure issue of fact" which should be given "great deference" on review, and the clearly erroneous standard applies. *Hernandez v. New York*, 500 U.S. 352, 364-66 (1991).

made her emotional and caused her to start crying. Third, she stated that she had maintained a relationship with a man who had been charged with assault, and that she had visited him in jail. And fourth, she indicated that she was opposed to the death penalty.

The government exercised a peremptory strike to remove Juror #364 from the jury, and in response Northington challenged the government's strike as being race-based. After hearing the government's explanations for striking the juror, the District Court rejected Northington's argument. The Court explained,

> Based upon all the circumstances, including the fact that, prior to this strike, an African-American juror had already been empaneled, and taking into account the prosecutor's demeanor and credibility, we are satisfied that the Government's reason for striking the juror was not pretextual, and not in any way motivated by a discriminatory intent.

(App. at 159, 161.)

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Id.* at 85. A district court's assessment of motions made under *Batson* involves a three-step process. The defendant must first establish a prima facie case of race-based discrimination in the exercise of a peremptory strike. *Hernandez v. New York*, 500 U.S. 352, 358 (1991). Among the

47

factors the trial court may consider at this first step of the *Batson* inquiry are the number of racial group members in the panel, the nature of the crime, the race of the defendant and the victim, a pattern of strikes against racial group members, and the prosecution's questions and statements during the voir dire. *United States v. Clemons*, 843 F.2d 741, 746-48 (3d Cir. 1988).

Then, if the prima facie case has been made, "the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." *Id.* at 358-59. This step "does not demand an explanation that is persuasive, or even plausible," as the issue is not "the reasonableness of the asserted nonracial motive," but rather "the genuineness of the motive." *Purkett v. Elem*, 514 U.S. 765, 768-69 (1995).

Finally, if the government presents a race-neutral explanation, the defendant must prove purposeful discrimination by showing that the proffered explanation is pretextual. *Hernandez*, 500 U.S. at 359. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768.

Here, Northington's only support for his prima facie case is his assertion that the "Government exercised [its] peremptory challenge for no apparent justifiable reason[, and] had exercised at least two other peremptory challenges on qualified African-American jurors." (Northington Br. at 62.) The government's two strikes against African-Americans fell far short of any pattern, and indeed, the defense itself struck two African-Americans from the jury.

As the government explains,

> Of the approximately 145 [potential jurors] who had at that point been summoned to court to be interviewed (up to and including Juror #364), all but 43 were excused for cause or hardship. Of those remaining 43 jurors, nine were seated, 12 were excused by the government, and 22 were excused by the defense. There were six African-Americans in the remaining group of 43, two of whom were struck by the defense.

(Answering Br. at 135.)

Furthermore, two of the 12 jurors seated on the jury were African-American, as was the first alternate juror. Nor has Northington demonstrated that any other factor traditionally considered at the first step of the *Batson* inquiry supports that conclusion that peremptory challenges were exercised based on the race of potential jurors. Because Northington has failed to make a prima facie case, we will affirm the District Court's ruling.[32]

---

[32] Although we do not need to reach the second and third steps of the *Batson* inquiry, to remove any doubt of discriminatory taint, we note that Northington's contention that there was no race-neutral reason to strike Juror #364 is flatly wrong. Indeed, any one of the four race-neutral concerns identified by the government as to Juror #364, such as her opposition to the death penalty, or that her son, like Tybius Flowers, was shot while sitting in his car, would be sufficient to defeat Northington's *Batson* claim.

**H.**    **The District Court's jury instruction on RICO conspiracy did not constructively amend the indictment.**[33]

Merritt argues that the District Court constructively amended the indictment in violation of the Fifth Amendment because, whereas the indictment alleged that the KSO was the RICO enterprise at issue and that Merritt was a KSO member, the District Court instructed the jury that it could convict Merritt of RICO conspiracy even if it found that Merritt was not a member of the KSO. We begin by discussing the allegations contained in the indictment that pertain to Merritt's alleged participation in the RICO conspiracy, the government's evidence and argument at trial, the District Court's jury instruction on the crime of RICO conspiracy, and the jury's subsequent questions pertaining to the conspiracy.

The first count of the indictment, which alleged RICO conspiracy, accused Merritt of having been a member of a racketeering organization. According to Count One, "[t]he defendants and others were members of a regional criminal organization. … This criminal organization was the Kaboni Savage Organization ('KSO')." (App. at 450.) In a subsection titled "The Defendants and Their Roles in the Enterprise," Count One explained Merritt's alleged role in the KSO:

> The defendants' roles in the enterprise are as follows …   Defendant ROBERT MERRITT,

---

[33] "We exercise plenary review in determining whether there was a constructive amendment of the indictment[.]" *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006).

a/k/a "B.J.," a/k/a "Bishop," was a drug distributor and enforcer for the KSO. He participated in murders, murder conspiracy, arson, the distribution of controlled substances, carrying firearms during violent crimes, carrying a firearm during a drug trafficking crime, witness tampering, and witness retaliation.

(App. at 453.)

At trial, the government argued that Merritt, as a member of the KSO, committed the specific crimes enumerated in Count One of the Indictment. In its opening statement, for example, the government repeatedly asserted that Merritt "threw those gas cans in the living room." (App. at 3386, 3394-95.) The government also reminded the jury that Merritt committed the alleged crimes as a KSO member:

Members of the jury, the evidence in this case will show that the defendants Kaboni Savage, Steven Northington, Kidada Savage and Robert Merritt agreed to participate in the affairs of a racketeering enterprise involving drugs, money laundering, arson, witness tampering and murder.

(App. at 3479.)

While conceding that Merritt "may have been more on the periphery" of the KSO, the government argued in its summation that Merritt, like Kaboni, Kidada and Northington, knew the purpose of the conspiracy, and by selling drugs under the protection of Lamont Lewis, he, too, became a member of

51

the conspiracy knowing full well of its purpose.  Finally, the government also contended that Merritt and his co-defendants murdered the Coleman family "for the purpose of *maintaining or increasing* their position in the enterprise."  (App. at 15076 (emphasis added).)

Before the charging conference, Merritt filed proposed jury instructions that rejected the language addressing RICO conspiracy contained in our Court's model jury instructions. According to Merritt, the model language was inapplicable "[i]n a case [such as this] where the indictment alleges the actual, ten year existence of a specific, ongoing RICO enterprise[.]"  (Merritt Supp. App. at 122.)  Specifically, Merritt objected to the following portions of the model jury instruction for RICO conspiracy:

> One important difference is that, unlike the requirements to find (name) guilty of the RICO offense charged in Count (No.), in order to find (name) guilty of the RICO conspiracy charged in Count (No.) the government is not required to prove that the alleged enterprise actually existed, or that the enterprise actually engaged in or its activities actually affected interstate or foreign commerce.
>
> Similarly, unlike the requirements to find (name) guilty of the RICO offense, in order to find (name) guilty of the RICO conspiracy charged in Count (No.) the government is not required to prove that (name) was actually employed by or associated with the enterprise, or that (name)

agreed to be employed by or to be associated with the enterprise.

Nor does the RICO conspiracy charge require the government to prove that (name) personally participated in the operation or management of the enterprise, or agreed to personally participate in the operation or management of the enterprise.

Rather, you may find (name) guilty of the RICO conspiracy offense if the evidence establishes that (name) knowingly agreed to facilitate or further a scheme which, if completed, would constitute a RICO violation involving at least one other conspirator who would be employed by or associated with the enterprise and who would participate in the operation or management of the enterprise.

(Merritt Supp. App. at 122-24 (quoting in part the Third Circuit Model Criminal Jury Instructions 6.18.1962D RICO Conspiracy-Elements of the Offense (18 U.S.C. §1962(d))).)

In opposing the model instruction, Merritt said it was "seemingly designed to accommodate a situation where individuals knowingly conspire to do something which, if successful, would intentionally promote the establishment of an as yet non-existent enterprise, the interests of which the conspirators then intend to conduct through a pattern of racketeering activity." (Merritt Supp. App. at 124.) In a second filing, Merritt proposed a RICO conspiracy charge that required the jury to first find as proven against Merritt all of the indictment's factual allegations pertaining to RICO

conspiracy before finding him guilty of RICO conspiracy. Merritt now explains that he objected to the model language and proposed his own jury instruction "omit[ting] the objectionable language" because the model language relieved the government of having to prove "the very facts that it had alleged in the Indictment and that it had spent three months trying to prove." (Merritt Opening Br. at 44-45.)

The District Court gave a RICO conspiracy instruction that reflected our Court's model instruction. In particular, the Court told the jury that the government did not have to prove that the racketeering enterprise existed or that any defendant was a member of that enterprise:

> [T]he government is not required to prove that the alleged enterprise was actually established, that the defendant was actually employed by or associated with the enterprise, that the defendant was actually engaged in, or its activities actually affected, interstate or foreign commerce, or that the defendant actually committed any racketeering act.

(App. at 15139.)

Merritt renewed his objection to that instruction at the conclusion of thedistrict court's charge. He argues that it effectively amended the indictment.

"A constructive amendment to the indictment constitutes 'a per se violation of the fifth amendment's grand jury clause'" because it deprives the defendant of his right to be indicted by a grand jury. *United States v. Syme*, 276 F.3d

131, 148, 154 (3d Cir. 2002) (citation omitted). "An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006). Such a modification impermissibly "amend[s] the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment." *United States v. Lee*, 359 F.3d 194, 208 (3d Cir. 2004).

"The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." *Daraio*, 445 F.3d at 260 (citation omitted). In other words, even when the district court instructs the jury on the very same statute that the indictment charged the defendant to have violated, the district court constructively amends the indictment if it instructs the jury that it can convict the defendant based on *facts not alleged in the indictment*.

The Supreme Court's decision in *Stirone v. United States*, 361 U.S. 212 (1960), illustrates the requirement that the factual basis for a conviction cannot exceed the four corners of the indictment. There, the indictment charged Stirone with a Hobbs Act violation because he used his influential union position and extortion to unlawfully interfere with the interstate importation of sand. *Id.* at 213-14. Over Stirone's objection, the district court allowed the government to offer evidence "of an effect on interstate commerce not only in sand … but also in interference with steel shipments …." *Id.* at 214. The Court held that, even though the government indicted

55

Stirone with the "two essential elements of a Hobbs Act crime: interference with commerce, and extortion[,]" "when only one particular kind of commerce [i.e., sand,] is charged to have been burdened[,] a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened." *Id*. at 218.

Applying *Stirone*, we similarly focused on the indictment's factual allegations in *United States v. McKee*, 506 F.3d 225 (3d Cir. 2007). In that case, the indictment charged the defendants with attempting to evade taxes by "preparing, signing, and causing the filing of false and fraudulent federal employment tax returns." *Id.* at 230. The district court, however, instructed the jury that the government could prove the charge by showing the defendant falsified books and records. *Id.* at 229. In vacating the defendants' convictions, we explained that "the problem here is that the jury instructions informed the jury that the Defendants could be convicted on the basis of conduct that was not charged in the indictment, of which they had no notice." *Id.* at 231. And even if the jury did in fact convict the defendants on the facts alleged in the indictment, "it is nearly impossible for a defendant to demonstrate that his/her conviction was based on particular evidence or a particular theory." *Id.* at 232.

We agree with Merritt that the theory that permeates the indictment and the government's trial arguments is that he was a KSO member and thus a member of the RICO enterprise. We also agree that the jury likely believed that Merritt was *not* a

KSO member.[34]  We part ways with Merritt, however, as to his assertion that his conviction cannot stand because "[t]he indictment never alleged that Merritt was a 'non-member' of the KSO who nevertheless conspired to further its criminal aims." (Merritt Opening Br. at 46.)  In addition to charging Merritt with membership in a RICO organization under 18 U.S.C. § 1962(c), the indictment also charged him with RICO conspiracy under § 1962(d).[35]  That the indictment charged Merritt with both crimes did not oblige the government to

---

[34] It is likely that the jury believed that Merritt was not a KSO member, but that he nonetheless participated in the conspiracy as to the firebombing.  The jury found Merritt guilty only of conspiracy but declined to convict him for the RICO murder charges.  Moreover, during deliberations, the jury specifically asked the District Court whether membership in a racketeering enterprise is a prerequisite for a RICO conspiracy conviction.

[35] Section 1962(c) proscribes membership in a RICO enterprise:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1962(d), in contrast, provides that "It shall be unlawful for any person to conspire to violate … subsection … (c) of this section."

prove any, let alone every, alleged fact pertaining to the § 1962(c) charge as a prerequisite to establishing that Merritt joined a RICO conspiracy under § 1962(d).

Here, even though the jury acquitted Merritt of the six murders in aid of racketeering and of one charge of conspiracy to commit murder in aid of racketeering, the jury explicitly found beyond a reasonable doubt that Merritt at least attempted to aid in the firebombing of the Coleman family.[36] That suffices for liability under the RICO conspiracy provision because a RICO conspiracy charge requires only proof of an agreement to assist the RICO enterprise in its criminal objectives. *See Salinas v. United States*, 522 U.S. 52, 64 (1997) (holding for the purpose of the RICO conspiracy

---

[36] The jury found that Merritt:

knowingly and intentionally murdered, knowingly aided and abetted, and willfully caused the murder of, and aided, agreed or attempted to aid, and solicited another to commit, the murders of Marcella Coleman (sentencing factor #9), Tameka Nash (sentencing factor #10), Sean Anthony Rodriguez (sentencing factor #11), Tajh Porchea (sentencing factor #12), Khadijah Nash (sentencing factor #13), and Damir Jenkins (sentencing factor #14), human beings, all in violation of the laws of the Commonwealth of Pennsylvania, that is, Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 2502(a) and 306.

(App. at 668.)

provision that, "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators").

The circumstances here, then, are distinguishable from those in *Stirone* and *McKee*. In those cases, the trial courts' instructions authorized the jury to return a guilty verdict based on conduct different than that set forth in the indictment, whereas here, the jury charge did not expand the factual basis on which Merritt could be convicted. Although the government alleged more facts in the indictment than it proved to the jury's satisfaction at trial, the indictment alleged Merritt's involvement in the RICO conspiracy, and Merritt has not identified any reason why we should doubt that the jury convicted Merritt for RICO conspiracy based on facts alleged in the indictment, namely, that he "agreed to participate in the affairs of a racketeering enterprise involving … arson." (App. at 3479 (Count One of the Indictment).)

## I. The District Court did not commit plain error in violation of *Apprendi* in imposing a life sentence on Merritt.

Merritt argues that, because the jury did not make the specific finding that Merritt's RICO conspiracy conviction was "based on" a RICO qualifying activity for which the maximum penalty is life imprisonment, his sentence for life imprisonment violated *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which requires that any fact that increases a defendant's sentence beyond the default statutory maximum must be found

by a jury.[37]  The government responds that the jury verdict sheet did connect the RICO conspiracy conviction with the Coleman murders, which were RICO qualifying crimes, and that, even if the status of the murders as RICO qualifying activities could have been made more explicit to the jury, the phrasing of the verdict sheet was certainly not plain error.

Merritt admits that he did not raise this issue below. Accordingly, the District Court's sentence must stand unless Merritt can establish plain error.  *United States v. Olano*, 507 U.S. 725, 730 (1993).  To do so, he must prove that: (1) the Court erred; (2) the error was obvious under the law at the time of review; and (3) the error affected substantial rights, that is, the error affected the outcome of the proceedings.  *Johnson v. United States*, 520 U.S. 461, 467 (1997).  If all three elements are established, we may, but need not, exercise our discretion to award relief.  *Id.*  That discretion should be exercised only in cases where the defendant is "actually innocent" or the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  *Olano*, 507 U.S. at 736-37.

---

[37] The Supreme Court explained that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.  The Fourteenth Amendment commands the same answer in [a] case involving a state statute."  *Apprendi*, 530 U.S. at 476  (internal citation and quotation marks omitted).

To secure a RICO conspiracy conviction, the government must prove, among other things, that the defendant engaged in "a pattern of racketeering activity," 18 U.S.C. § 1962, which requires at least two acts in furtherance of the RICO conspiracy. *United States v. Fattah*, 914 F.3d 112, 163 (3d Cir. 2019). The maximum penalty for violating the RICO statute is 20 years in prison unless "the violation is *based on* a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a) (emphasis added).

The jury found Merritt guilty of engaging in a RICO conspiracy. For each defendant, the jury was also "required to unanimously find, beyond a reasonable doubt" whether the government had "proven" or "not proven" that he or she committed other crimes. (App. at 662-63.) The other crimes were listed as "Special Sentencing Factors," and included drug distribution conspiracy, the individual murders, the Coleman family murders, and witness retaliation, as defined by federal or Pennsylvania law. (App. at 662-669.)

Under special sentencing factors #9 through #14, the jury found as "proven" Merritt's involvement in the Coleman family murders. Murder was defined under Pennsylvania law, and the verdict form definition read as follows:

> On or about October 9, 2004, in Philadelphia, in the Eastern District of Pennsylvania, the defendants KABONI SAVAGE, ROBERT MERRITT, and KIDADA SAVAGE, *knowingly and intentionally murdered, knowingly aided and abetted and willfully caused the murder of and aided, agreed or attempted to aid, and*

61

*solicited another to commit*, the murders of [the Coleman Family], all in violation of the laws of the Commonwealth of Pennsylvania, that is, Title 18 Pennsylvania Consolidated Statutes Annotated, Sections 2502(a) and 306.

(App. at 668 (emphasis added).)

Merritt asserts that the jury instructions erroneously failed to require that the jury find that his RICO conspiracy violation was "based on" a RICO qualifying activity. In Merritt's view, because the verdict sheet did not explicitly state that special sentencing factors #9 through #14 were RICO qualifying activities, and notwithstanding the jury's finding under those factors that, at a minimum, Merritt knowingly agreed to aid or attempt to commit the Coleman murders, it is possible that the jury may have premised Merritt's RICO conspiracy conviction on RICO qualifying activities other than murder.[38] In support, Merritt points out that the jury did not

_____

[38] Merritt argues that the Special Sentencing Factors are deficient for two additional reasons. First, he says that the language of the verdict sheet contains a "legal flaw" that "reinforce[s] the unreliability of the jury's verdict," in that "it told jurors that their finding had to be beyond a reasonable doubt either way, proven or not proven." (Merritt Opening Br. at 18 n.5 (citing the following statement in the verdict sheet: "We, the jury, unanimously find that special sentencing factors #9 through #14, as to defendant Robert Merritt, are: __ Proven ___ Not Proven").) Second, Merritt objects that special sentencing factors #9 through #14 permitted the jury to find first-degree murder in violation of Pennsylvania law without finding specific intent to kill. (Merritt Opening Br. at 18 n.6.)

find him guilty of the several counts of RICO murder alleged against him.

If Merritt is correct that murder was not the predicate act on which the jury found him guilty of RICO conspiracy, then his sentence should have been no greater than the twenty-year statutory maximum. Although the verdict sheet could have more clearly indicated that the sentencing factors were crimes on which the RICO conspiracy charge was based, any error was not obvious and was unlikely to have impacted Merritt's sentence. First, the jury verdict form listed the special sentencing factors as clear sub-parts of the RICO conspiracy count. Second, the special sentencing factors were prefaced with the following: "If you have found one or more

---

Merritt's first point is immaterial because neither party disputes that the jury found Sentencing Factor Nos. 9-14 proven beyond a reasonable doubt as to Merritt. As to the second point, Merritt acknowledges that second-degree murder also permits a life sentence and does not require a finding of specific intent. In any event, the District Court did instruct the jury about the specific intent requirement for first-degree murder. (*See* App. at 15172 ("Ladies and gentlemen, under Pennsylvania law, first degree murder is an intentional killing. A killing is intentional if it's committed by lying in wait or by otherwise willful, deliberate and premeditated means.")); (App. at 15174 ("[T]o be guilty of aiding and abetting, the defendant must possess the intent to promote or facilitate the commission of the crime. In the case of first degree murder, ladies and gentlemen, the defendant must have specifically intended that the murder occur in order for the defendant to be guilty of first degree murder under a theory of accomplice liability.")).

63

of the defendants guilty *as to Count 1*, you are also required to unanimously find, beyond a reasonable doubt, whether those defendants *committed the acts described* in the following special sentencing factors: ….'' (App. at 662 (emphasis added).) Finally, the District Court instructed the jury: "There are with regard to the conspiracy count a series of sentencing factors that we ask you to consider." (App. at 15222.) Accordingly, it is implausible that the jury understood the sentencing factors as describing acts unrelated to the RICO conspiracy.[39]

Moreover, Merritt's argument would require us to credit his theory that, even though the jury found that he joined the RICO conspiracy, and even though it found that he participated in the Coleman family murders, the jury determined that his assistance in carrying out those murders was *not* in furtherance of the conspiracy, and that Merritt did other, unidentified acts in furtherance of the conspiracy such as, perhaps, selling drugs on behalf of the KSO, that connected him to the RICO conspiracy. This argument strains reason, especially considering that the Coleman murders were the only special sentencing factors that the jury found proven as to Merritt.

---

[39] Merritt cites *Burrage v. United States*, 571 U.S. 204 (2014), to support his "based on" argument, but that case is inapposite. *Burrage* considered a statute that increases a defendant's mandatory minimum sentence if the government proves that death "results from" a narcotics distribution offense. *Id.* at 209. The Supreme Court held that, as a matter of statutory interpretation, the "death results" language imports a "but-for causality" requirement, and not merely a requirement that narcotics use was a contributing factor in causing death. *Id.* at 216.

64

Because Merritt has not met his burden of establishing that the error was obvious and affected his substantial rights, any error here cannot be described as plain. Additionally, in light of the jury's unequivocal finding that Merritt assisted in incinerating an entire family, a semantic shortcoming in the verdict form is insufficient to satisfy the fourth (and discretionary) clear error factor, which looks to the justice of the outcome and whether it would seriously affect the public reputation of judicial proceedings. On the contrary, were we to reduce Merritt's life sentence for such a heinous crime, and were we to do so on a ground he did not bother to raise at trial, that might call our criminal justice system into disrepute. His life sentence is well founded.

## III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.